Corey WASHINGTON, a Minor by his
Mother and Next Friend, Valerie
WASHINGTON, Respondents,

v.

BARNES HOSPITAL, et al., Appellants.

No. 77042.

Supreme Court of Missouri,
En Banc.

April 25, 1995.

Rehearing Denied May 30, 1995.

Kenneth W. Bean, John J. Pawloski, St. Louis, for appellants.

Myron S. Zwibelman, Michael Gross, St. Louis, for respondents.

PRICE, Judge.

This is an appeal from a decision of the Circuit Court of the City of St. Louis entering judgment in accordance with a jury verdict against Appellants Barnes Hospital, Dr. David Weinstein and Dr. Jane Corteville (defendants) and in favor of Respondents Corey Washington and Valerie Washington (plaintiffs). Defendants were found negligent in failing to timely diagnose Valerie Washington's placental abruption and to timely perform a cesarean section, resulting in permanent brain damage to Ms. Washington's son, Corey. We hold that the trial court properly denied defendants' motions for directed verdict and JNOV. However, we also hold that defendants should have been allowed to introduce evidence of the availability of free educational services and therapies through the public special education program in mitigation of damages and we remand for a new trial on the issue of damages. This Court has jurisdiction pursuant to article V, section 10 of the Missouri Constitution.

## I.

Valerie Washington was 27 years old and approximately 32 weeks pregnant with twins on January 30, 1987. That morning, she suffered periodic abdominal pains that she attributed to gas. At about 4:00 p.m., Ms. Washington walked to the bus stop to pick up her daughter and experienced more abdominal pain. She then picked up her mother from work and returned home.

At home, Ms. Washington laid down across her bed. According to Ms. Washington, "[t]hat's when my stomach kind of got big, and she [Ms. Washington's mother] said, 'I better call the ambulance.' And I said, 'I think you better because something ain't right.'" Ms. Washington described the sensation as the babies "doubling up on me."

At 4:51 p.m., an ambulance was dispatched, and Ms. Washington arrived at Barnes Hospital at 5:10 p.m. The ambulance record indicates that Ms. Washington was vomiting and experiencing contractions three minutes apart. She told the ambulance attendants that she was "suspecting twins, possibly triplets." The events that occurred in the hour and a half after Ms. Washington arrived at Barnes Hospital are crucial to her claim. A timeline of the relevant events is as follows:

4:51 p.m. Ambulance is dispatched and picks up Ms. Washington.

5:10 p.m. Ms. Washington arrives at Barnes Hospital.

5:22 p.m. Ms. Washington arrives at Labor & Delivery; Nurse Spiller feels a hard uterus/abdomen.

5:25 p.m. Dr. Weinstein is summoned. Thereafter, contractions are mild. Ms. Washington is unable to give "meaningful information." An ultrasound is performed.

5:27 p.m. Fetal scalp monitor records Baby A's (Cortland's) heartbeat. Due to the positioning of the twins, Baby B (Corey) could only be monitored by manual ultrasound.

5:32 p.m. Fetal scalp monitor readout ends.

5:39 p.m. Ms. Washington confirms she may be pregnant with twins. Dr. Weinstein summons Dr. Corteville.

5:40 p.m. Dr. Corteville arrives. She observes no point pain, no vaginal bleeding, a soft uterus and mild contractions.

5:58 p.m. Fetal scalp monitor resumes heartbeat data for Baby A. Baby B's (Corey's) heartbeat is monitored by manual ultrasound.

6:08 p.m. Baby A's heartbeat drops from the 120s, or normal, to the 90s. Baby B's heartbeat drops to 50s. Dr. Corteville, using manual ultrasound, observes Baby B become limp.

6:10 p.m. Dr. Corteville orders cesarean section. Ms. Washington refuses to sign the consent until Dr. Corteville tells her that without it, the babies would die.

6:13 p.m. Ms. Washington signs consent to cesarean section.

6:24 p.m. Baby A (Cortland) is delivered.

6:25 p.m. Baby B (Corey) is delivered.

Visual examination and subsequent analysis of the placenta revealed that Corey had experienced a complete placental abruption sometime prior to birth, depriving him of oxygen.

During the pretrial conference, plaintiffs' attorney made a verbal motion in limine concerning evidence defendants might introduce as to the availability of free education and therapies through the public special education system. Plaintiffs based the objection upon the collateral source rule. Defendants' counsel argued that the collateral source rule did not apply, both because plaintiffs had not prepaid for such services, as with insurance, and because special education is available to the public at large without consideration of financial need. The court sustained plaintiffs' motion. On the Tuesday before the evidence started, defendants filed a written motion asking the court to reconsider its ruling. The motion was denied.

At trial, plaintiffs presented the testimony of two medical experts, Dr. William Hummer and Dr. Walter Molofsky.[1] Dr. Hummer testified regarding the standard of care. Dr. Hummer stated the clinical signs and symptoms of an abruption as: uterine contractions that are more intense and last longer than regular contractions; the uterus becoming hard for a few minutes; possible vaginal bleeding; and possible signs of fetal distress. He testified that the heartbeats of both babies showed decelerations from the beginning. He testified that Drs. Weinstein and Corteville were negligent in failing to diag-

---

1. Because this matter is considered in terms of the submissibility of plaintiffs' case, we focus primarily upon the evidence submitted by plaintiffs.

nose the abruption sooner and proceed earlier with the cesarean section. He stated:

I think by seventeen thirty-nine [5:39 p.m.], there was enough information to make a presumptive diagnosis of abruption. And at that point in time, being aware of the fact that in a premature set of twins like this the abruption represents a significant greater risk to the babies than delivering them and having their lungs not being mature they should have had proceeded at that point in time to prepare for a cesarean.

Defendants' experts, on the other hand, asserted that Ms. Washington's symptoms did not clearly point to an abruption. Ms. Washington, who had previously given birth to a healthy child, did not complain of uterine contractions that were more intense than regular contractions. Defendants also contend that Ms. Washington never had a firm uterus, her contractions did not last longer than regular contractions, no vaginal bleeding was present, and no signs of fetal distress occurred. Thus, the risk of delivering the twins prematurely outweighed other risks until 6:08 p.m., when the heartbeats dropped, indicating fetal distress. Defendants argue there was no negligence, as the cesarean section was ordered two minutes later, at 6:10 p.m., and the babies were delivered within fifteen minutes thereafter.

Defendants further rely upon Dr. Hummer's testimony that the American College of Obstetrics generally states that the first incision should be made within thirty minutes after deciding to perform an emergency cesarean section, and that the first baby should be delivered three minutes after that. Thus, they argue even if the diagnosis should have been made at 5:39 p.m., they should be allowed until approximately 6:13 p.m., only shortly before when the babies were born anyway, as a matter of causation.

Dr. Molofsky, plaintiffs' causation expert, testified that at the time of trial, when Corey was five, his mental level was that of a four-month-old's. He testified that Corey would never be able to walk or sit on his own. He testified that Corey will need complete custodial care, physical therapy to maintain some effectability of his arms and legs, occupation-al therapy to help his arm functioning and positions, and speech and language therapy for assistance in eating. Dr. Molofsky testified that Corey's brain damage was caused by a lack of oxygen prior to birth because Ms. Washington suffered a complete placental abruption. He estimated that a child could survive inside the mother for no longer than fifteen minutes following a complete abruption. He testified that he did not know exactly when the abruption started.

Defendants' experts, on the other hand, claimed that Corey's injuries were due to a partial abruption that had been taking place all day, and that his injuries were essentially complete by the time Ms. Washington arrived at Barnes. On cross-examination, Dr. Molofsky conceded that injuries such as Corey's could result from a partial abruption that lasted for hours or even days, even if the complete abruption was not until right before birth. However, he testified on redirect examination that in such a case he would not expect to see a fetal heartbeat of 120 shortly before birth, and he believed Corey's injuries were caused by the complete abruption.

Plaintiffs called Alan Spector as an expert to testify regarding Corey's future needs for special education and therapy. Mr. Spector testified that, in order to be cared for at home, Corey would need: physical therapy, occupational therapy, and speech and language therapy twice weekly; special education at a private school; weekly visits from a nurse; a lifetime supply of diapers, bedliners and bibs; a personal attendant eight hours a day on school days and twelve hours a day on weekends and holidays; someone to provide counseling and support for Ms. Washington; a case manager until age 21; remodeling of a home, including a heated garage and special fire doors; a van with a wheelchair lift; and a computer. Mr. Spector also testified as to Corey's needs should he be institutionalized.

During his testimony, Mr. Spector several times injected comments regarding Ms. Washington's financial need. He stated that plaintiffs currently were renting their home, and that they previously had to move because of financial reasons. In answer to a question whether the family has a wheel-

chair, he nonresponsively replied, "No, I'm not sure that the mother has an automobile at all. Maybe she's not able to afford one." Later, he implied that Corey was transported in a stroller because the family could not afford a wheelchair.

> Q. At either of the meetings you had with the child and the mother at Mr. Zwibelman's office, did they bring any specialized equipment there?
>
> A. My recollection, I guess that there was some kind of a—I want to say a stroller. But some kind of a device that people get when they don't have a wheelchair. I mean a wheelchair is fairly expensive and cumbersome. . . .

Finally, he concluded his direct examination by listing things he had not included in the plan, such as medical insurance. He stated:

> Medical Insurance. I'll just mention again, in my role of educator and the assistant to the family, that medical insurance is very difficult if not certainly impossible to get for a person with disabilities. . . .

Defendants requested that they be allowed to present evidence to the jury of available free public special education because plaintiffs' had opened the door with this evidence, but the court refused the request.

At the end of plaintiffs' evidence, defendants moved for a directed verdict, which was denied. The jury returned verdicts against all defendants in favor of Valerie Washington in the amount of $500,000 and in favor of Corey Washington in the amount of $5,000,000. Defendants then moved for a judgment notwithstanding the verdict (JNOV). The court entered judgment in accordance with the verdicts, but reduced the jury's award of non-economic damages for Valerie Washington from $480,000 to $446,000 and for Corey Washington from $1,209,000 to $446,000, pursuant to § 538.210, RSMo 1994.

## II.

### A.

■ Defendants claim that plaintiffs failed to make a submissible case, and the trial court erred in denying their motions for directed verdict and JNOV. While a case may not be submitted "unless each and every fact essential to liability is predicated upon legal and substantial evidence", *Houghton v. Atchison, Topeka and Santa Fe Railroad Company,* 446 S.W.2d 406, 409 (Mo. banc 1969), the Court must also view the evidence in the light most favorable to the plaintiffs and give to the plaintiffs the benefit of all reasonable inferences. *See Black v. Kansas City Southern Railway Co.,* 436 S.W.2d 19, 23 (Mo. banc 1968); *Gregory v. Robinson,* 338 S.W.2d 88, 91 (Mo. banc 1960). A "case may not be withdrawn from the jury unless there is no room for reasonable minds to differ". *Gregory,* 338 S.W.2d at 91.

■ To make a submissible case in a medical malpractice action, plaintiffs must prove that defendants failed to use that degree of skill and learning ordinarily used under the same or similar circumstances by members of defendants' profession and that their negligent act or acts caused plaintiffs' injury. *See Swope v. Printz,* 468 S.W.2d 34, 39 (Mo. 1971); *M.A.I. 21.01.* Defendants attack plaintiffs' proof both on the elements of negligence and causation. First, defendants claim that plaintiffs' liability expert's opinion was not supported by the facts in the record and therefore could not establish a submissible case. Second, defendants claim that plaintiffs did not establish "but for" causation.

### B.

#### i.

■ Plaintiffs relied upon the testimony of their expert, Dr. William Hummer, to establish defendants' negligence. Defendants contend that the opinion stated by Dr. Hummer was speculative and not supported by the evidence in the record. Defendants further argue that *Adams v. Children's Mercy Hosp.,* 848 S.W.2d 535, 548 (Mo.App.1993), and *Pippin v. St. Joe Minerals Corp.,* 799 S.W.2d 898, 904 (Mo.App.1990), stand as authority for disregarding Dr. Hummer's testimony, even though admitted into evidence without objection, because lack of an evidentiary foundation for an expert's opinion may be considered when determining submissibility. Defendants' argument fails, however, be-

cause it confuses the issue of the admissibility of Dr. Hummer's opinion testimony with the issue of the submissibility of plaintiffs' case.

■ The distinction between the admissibility of an expert's opinion testimony and the submissibility of a plaintiff's case in reliance thereon was discussed previously in *Callahan v. Cardinal Glennon Hosp.*, 863 S.W.2d 852, 860[4] (Mo. banc 1993). If a question exists as to whether the proffered opinion testimony of an expert is supported by a sufficient factual or scientific foundation, the question is one of admissibility. It must be raised by a timely objection or motion to strike.

Once opinion testimony has been admitted, as any other evidence, it may be relied upon for purposes of determining the submissibility of the case. *See Goodman v. Allen Cab Company*, 360 Mo. 1094, 232 S.W.2d 535, 539 (1950). The natural probative effect of this testimony is a consideration for the jury. *DeMoulin v. Roetheli*, 354 Mo. 425, 189 S.W.2d 562, 565 (1945).

Here, defendants objected several times during Dr. Hummer's testimony. Each objection, however, was specific to the question asked and did not challenge the foundation of Dr. Hummer's opinion. Further, defendants did not challenge the scientific or factual foundation of Dr. Hummer's opinion at any time while he was testifying.

In *Seabaugh v. Milde Farms, Inc.*, 816 S.W.2d 202, 209 (Mo. banc 1991), this Court clearly held that an objection or motion to strike is untimely if it comes "too late to give opposing counsel an opportunity to correct any deficiencies in the questions or lay an appropriate foundation for the witness's opinion." To hold otherwise would encourage "sandbagging" and delay resolution of problems that might be correctable with a few questions, until a time where the expense and burden of a new trial would be involved. By failing to timely object or make a motion to strike, defendants waived any issue they might have had to the admissibility of Dr. Hummer's opinion testimony. They may not raise these matters now under the guise of submissibility. To the extent that they indi-

cate to the contrary, *Adams* and *Pippin* should not be followed.

ii.

■ Dr. Hummer's testimony, along with the other facts in the record established a submissible case for negligence against all three defendants. Hummer stated that the clinical signs of abruption are: uterine contractions that are more intense and last longer than regular contractions; the uterus becoming hard for a few minutes; vaginal bleeding; and signs of fetal distress. Nurse Spillar felt a hard uterus/abdomen at 5:22 p.m. Analyzing the fetal scalp monitor strip, Dr. Hummer stated that "virtually everything in this strip picks up, we have, is all decelerations." He further testified that "decelerations as well as the hard abdomen, the rigid abdomen, were clinical signs of abruption." He also noted that vaginal bleeding might not have been present because the bleeding might have been trapped behind the placenta and that "not all women with abruptions have elevated blood pressure." Finally, Dr. Hummer indicated his opinion in response to counsel's question as follows:

Q Doctor. You indicated that they should have started preparing for the cesarean section at seventeen thirty-nine. I want you to assume that if a C-section was not performed, and preparations for a C-section were not begun by seventeen thirty-nine, it was seventeen-forty, would the failure to begin preparations for a cesarean section at seventeen-forty by the physicians there be a failure to exercise that degree of expertise, that degree of skill, and learning ordinarily exercised by members of Dr. Weinstein's profession and Dr. Coreyville's [sic] profession?

A Yes.

This evidence is sufficient to make a submissible case of negligence against Dr. Weinstein and Dr. Corteville.

It is noted that Dr. Corteville did not see the patient until 5:40. She could not have been "instantly" negligent by walking into the room. Upon entering the room, Dr. Corteville received a "brief synopsis" of Ms. Washington's history from Dr. Weinstein and

spoke with Nurse Spiller. While the record does not include direct evidence as to whether Dr. Corteville was informed of Nurse Spiller having found a hard uterus/abdomen, this is an inference the jury could have made. Defendants did not object, however to the form of the question to Dr. Hummer as to the doctors' joint negligence and the jury could have further inferred that from the information available to her at the time, Dr. Corteville could have ordered the cesarean section within a matter of a few minutes without conducting her own examination or ultrasound procedure.

In addition to respondeat superior liability, Dr. Hummer's testimony also established a submissible case against Barnes Hospital directly. Ms. Washington arrived at Barnes Hospital at 5:10 p.m. She was not moved to labor and delivery until 5:22 p.m. Dr. Hummer faulted this treatment of Ms. Washington because she was retained in the emergency room for approximately twelve minutes, but the medical record did not evidence that any obstetrical evaluation took place in the emergency room, or that if an evaluation took place, it was not recorded so that it could be used in the labor and delivery room. After noting that:

> Other emergency rooms choose not to do [obstetrical evaluations], but merely pass the patient on directly to the Labor and Delivery.... But if such an assessment is not done in the emergency room then the patient should not be kept in the emergency room for any period of time before she goes to the labor area to be evaluated because there may be a problem. In obstetrics, we often don't have a lot of time.

Dr. Hummer indicated his opinion as follows:

> Q I want you to assume that the evaluation or the treatment, if any, is as reflected on Plaintiff's Exhibit 6 or assume that there would be an examination, she was seen but not examined or seen and examined, but never recorded. She arrived at seventeen-ten; she got to the Labor and Delivery Room at seventeen twenty-five. Would the fifteen minute delay

between [Ms. Washington's] arrival [at Barnes Hospital Emergency Room] and the first written complete evaluation be a failure to exercise that degree of skill, expertise, and learning exercised by hospitals around the country?

> A Yes.

### C.

Plaintiffs' relied upon the testimony of their expert, Dr. Molofsky, to establish causation. Defendants contend that plaintiffs did not establish "but for" causation[2] because: the testimony of Dr. Molofsky is in irreconcilable conflict with that of Dr. Hummer; Corey Washington's injuries occurred earlier in the day; and even had the diagnosis of abruption been made earlier, it still would not have prevented Corey's injuries because defendants should be allowed thirty minutes from the time of diagnosis to deliver the child.

### i.

■ To establish causation, Dr. Molofsky testified that a complete placental abruption cut off the supply of oxygen to Corey Washington, resulting in brain damage. Dr. Molofsky further testified that the abruption could not have been complete more than fifteen minutes before Corey's birth, as death of the unborn child will occur approximately fifteen minutes after a complete abruption. Hence, the failure of defendants to timely diagnosis the abruption and begin the cesarean procedure resulted in the injuries suffered by Corey Washington.

Defendants contend that this testimony is irreconcilable with the testimony of Dr. Hummer and cannot be considered as sufficient evidence to support a submissible case for purposes of causation. As we have already discussed, Dr. Hummer testified that the abruption should have been diagnosed at 5:39 p.m. Defendants contend that if the abruption did not occur until 6:10 p.m., according to Dr. Molofsky's testimony, that it could not have been diagnosed at 5:39 p.m., in accordance with Dr. Hummer's testimony.

---

**2.** "But for" causation is causation in fact as opposed to proximate cause, which also includes a legal determination. *Callahan v. Cardinal*

*Glennon Hosp.,* 863 S.W.2d 852 (Mo. banc 1993); *Delisi v. St. Luke's Episcopal–Presbyterian Hosp., Inc.,* 701 S.W.2d 170, 175 (Mo.App.1985).

Conversely, if the abruption occurred at 5:39 p.m. or before, Corey Washington would have died before birth.

Defendants, however, do not grant to plaintiffs all reasonable inferences. While Dr. Molofsky testified that a *complete* abruption could not have occurred prior to 6:10 p.m., he indicated that he did not know when the abruption might have started. There is no evidence that would preclude an inference that a partial abruption occurred earlier in the day, that it might have been diagnosed at or before 5:39 p.m., and that it did not become complete and disrupt the oxygen supply to Corey until at or about 6:10 p.m.

Similarly, defendants argue that plaintiffs should be bound by a statement made by counsel in opening argument that "the evidence is, and the evidence will be that at six o'clock, or six zero five, eighteen hundred, eighteen-o-five, these babies, especially Corey was healthy. His heart beat was good. His tone was good." They contend that this admission is also in irreconcilable conflict with Dr. Hummer's testimony that a diagnosis should have been made at 5:39. Again, this is certainly evidence for the defense to argue to the jury. However, the statement is not so clear as to mandate that a partial abruption had not begun, that heart decelerations could not have occurred, that a diagnosis should not have been made and that plaintiffs' proof is so inconsistent and mutually repugnant as to constitute the failure to make a case. See for comparison *Thomas v. Myers,* 655 S.W.2d 695, 697 (Mo.App.1983).

### ii.

Defendants alternatively argue that if a partial abruption started earlier, injury to Corey also would have started earlier and would not have been caused solely by the untimely diagnosis. Again, this is a valid argument. However, it is based upon a weighing of various facts in evidence and does not establish an absence of facts or a conflict so irreconcilable that would require the issue to be removed from the jury. The jury could properly have found that a partial abruption occurred earlier in the day, it could have been diagnosed by at least 5:39 p.m., but that Corey Washington's injury did not occur until after the abruption became complete at about 6:10 p.m..

### iii.

Finally, defendants claim that even had the abruption been diagnosed at 5:39 p.m., they could not be found legally responsible for any resulting damages until after 6:13 p.m. This argument is based upon Dr. Hummer's testimony that the American College of Obstetrics generally acknowledges that the first incision in a cesarean-section birth should occur within thirty minutes of the decision to proceed in that manner. After that, it takes three minutes to get the first baby out and a little longer to get the second baby out. The medical records in this case established, however, that Corey was delivered within fifteen minutes of Dr. Corteville's decision to perform a cesarean. Dr. Hummer also testified that had the diagnosis been made earlier, the time required to complete the procedure would have been the same. Thus, while there was evidence from which the jury could have found that an earlier diagnosis might not have prevented Corey Washington's injuries, there was also sufficient credible evidence for them to find that defendants could have delivered Corey within approximately fifteen minutes and that his injuries resulted from the failure to timely diagnose the abruption.

### D.

In short, defendants presented a strong case that might have been persuasive to a jury. Both negligence and causation were seriously challenged. The jury, however, rendered a verdict in favor of plaintiffs. So long as plaintiffs' evidence is sufficient that reasonable minds may differ as to the conclusion, the weight to be accorded contested evidence lies within the jury's domain. It was the jury's role, not the court's, to weigh the testimony of Dr. Hummer and Dr. Molofsky and defendants' experts, along with the other evidence admitted. The trial court properly denied defendants' motions for directed verdict and JNOV on the issue of submissibility.

## III.

Defendants argue they should have been permitted to submit to the jury evidence of the availability of free public special education and therapies. First, they maintain that such evidence does not fall within the collateral source rule. Second, they claim that plaintiffs waived their right to assert the collateral source rule by injecting into evidence statements concerning Ms. Washington's financial need. Either of these points would be sufficient to require reversal, since this evidence might have affected the jury's calculation of damages. Defendants preserved both points through repeated objections both before and during trial.

### A.

"The collateral source rule is an exception to the general rule that damages in tort should be compensatory only." *Overton v. United States*, 619 F.2d 1299, 1306 (8th Cir. 1980). Traditionally, Missouri courts have defined the collateral source rule as providing that "a wrongdoer is not entitled to have the damages to which he is liable reduced by proving that plaintiff has received or will receive compensation or indemnity for the loss from a collateral source, wholly independent of him, or, stated more succinctly, the wrongdoer may not be benefited by collateral payments made to the person he has wronged." *Collier v. Roth*, 434 S.W.2d 502, 506–07 (Mo.1968) (quoting 25 C.J.S. *Damages* § 99(1) at 1011).

Such a broad statement of the rule is of little help in determining its application here, however, because of the many different factual situations in which the collateral source rule has been and might be applied. In fact, the collateral source rule is not a single rule but rather, a combination of rationales applied to a number of different circumstances to determine whether evidence of mitigation of damages should be precluded from admission. Note, *Unreason in the Law of Damages: The Collateral Source Rule*, 77 Harv.L.Rev. 741, 748–53 (1964); *see also* Joel K. Jacobsen, *The Collateral Source Rule and the Role of the Jury*, 70 Or.L.Rev. 523 (1991).

Numerous rationales have been used to justify the application of the collateral source rule. Some courts state that plaintiffs who contract for insurance or other benefits with funds they could have used for other purposes are entitled to the benefit of their bargain. *See, e.g., Kickham v. Carter*, 335 S.W.2d 83, 90 (Mo.1960); *Overton v. United States*, 619 F.2d at 1306. Some courts enforce the collateral source rule to punish the tortfeasor. *See, e.g., Roth v. Chatlos*, 97 Conn. 282, 116 A. 332, 334 (1922); *Hubbard Broadcasting, Inc. v. Loescher*, 291 N.W.2d 216, 222 (Minn.1980). Other courts opine that, if one party will receive a windfall, it should be the plaintiff. *See, e.g., Werner v. Lane*, 393 A.2d 1329, 1336 (Me.1978); *Grayson v. Williams*, 256 F.2d 61, 65 (10th Cir. 1958). Additional rationales supporting the collateral source rule are: to protect plaintiffs against the inadequacy of public benefits or the uncertainty of their future availability, *Northern Trust Co. v. County of Cook*, 135 Ill.App.3d 329, 90 Ill.Dec. 157, 481 N.E.2d 957, 960 (1985), to recognize that the plaintiff, not the tortfeasor, was the intended beneficiary of gratuitous services, *Kaiser v. St. Louis Transit Co.*, 108 Mo.App. 708, 84 S.W. 199, 200 (1904), to compensate plaintiff for legal fees and expenses, *Hudson v. Lazarus*, 217 F.2d 344, 346 (D.C.Cir.1954), and to avoid prejudice in the eyes of the jury because plaintiff was attempting to recover for an item for which he had not paid, *Kickham v. Carter*, 335 S.W.2d at 90.

Missouri courts have applied the collateral source rule to prevent defendants from informing juries of: insurance policies contracted for and paid for by plaintiffs, *see, e.g., Iseminger v. Holden*, 544 S.W.2d 550, 553 (Mo. banc 1976); *Kickham v. Carter*, 335 S.W.2d at 90; *Protection Sprinkler Co. v. Lou Charno Studio, Inc.*, 888 S.W.2d 422, 424 (Mo.App.1994), *Blessing v. Boy Scouts of America*, 608 S.W.2d 484, 488–89 (Mo.App. 1980); contracted for payments, *see Collier v. Roth*, 434 S.W.2d 502, 507 (Mo.1968) (in accordance with an agreement with its supplier, plaintiff received payments that diminished its damages); and benefits from plaintiffs' employers, *see Douthet v. State Farm Mut. Auto Ins. Co.*, 546 S.W.2d 156, 159–60 (Mo. banc 1977) (workers' compensation benefits); *Leake v. Burlington Northern R. Co.*, 892

S.W.2d 359, 363 (Mo.App.1995) (disability pension benefits); *Mateer v. Union Pacific Systems*, 873 S.W.2d 239, 245 (Mo.App.1993) (retirement benefits); *Beck v. Edison Bros. Stores, Inc.*, 657 S.W.2d 326, 330–31 (Mo. App.1983) (employer's medical plan); *Siemes v. Englehart*, 346 S.W.2d 560, 563–64 (Mo. App.1961) (sick leave).

Missouri courts have also found evidence regarding some governmental benefits to be subject to the collateral source rule. These include both governmental benefits contingent upon plaintiff's financial need or special status, such as medicare and medicaid, and those at least partially contingent upon plaintiff's former service or payments, such as veterans' benefits and social security. *See Cornelius v. Gipe*, 625 S.W.2d 880, 882 (Mo. App.1981) (in dicta, found social security, medicare and medicaid to be collateral sources); *Hood v. Heppler*, 503 S.W.2d 452, 454–55 (Mo.App.1973) (veterans' benefits); *Weeks–Maxwell Const. Co. v. Belger Cartage Service, Inc.*, 409 S.W.2d 792, 796 (Mo.App. 1966) (social security).

Finally, Missouri courts have split on the issue of whether the collateral source rule applies to evidence of gratuitous services rendered to a plaintiff. Compare *Kaiser v. St. Louis Transit Co.*, 84 S.W. 199, 200 (Mo. App.1904) (holding that a plaintiff still was entitled to damages, even though he was nursed gratuitously by his wife and daughter), and *Aaron v. Johnston*, 794 S.W.2d 724, 726–27 (Mo.App.1990) (holding that gratuitous continuation of wages by plaintiff's employer would be a collateral source), with *Morris v. Grand Ave. Ry. Co.*, 46 S.W. 170 (Mo.1898) (holding that a plaintiff was not permitted to recover for services for which he did not pay), and *Gibney v. St. Louis Transit Co.*, 204 Mo. 704, 103 S.W. 43, 48 (1907) (holding that an injured mother could not collect damages for daughters' gratuitous nursing services).

■ Missouri courts have not previously addressed whether evidence of the availability of free public special education is precluded by the collateral source rule after a plaintiff has introduced evidence that special private schooling expenses will be required. At least four other states, however, have considered this issue.

The collateral source rule has been applied to exclude such evidence in at least three states. In *Williston v. Ard*, 611 So.2d 274, 278 (Ala.1992); *Ensor v. Wilson*, 519 So.2d 1244, 1266–67 (Ala.1987), reh'g denied, 537 So.2d 66 (Ala.1988); and *Healy v. White*, 173 Conn. 438, 378 A.2d 540, 546 (1977), overruled on other grounds *Petriello v. Kalman*, 215 Conn. 377, 576 A.2d 474 (1990), the courts primarily looked to whether the governmental source of education was truly independent and collateral of plaintiff and upon such a finding determined that the rule should be applied. In *Cates v. Wilson*, 321 N.C. 1, 361 S.E.2d 734, 736 (1987), the North Carolina Supreme Court held that introduction of evidence of the availability of public school programs was irrelevant, in violation of the collateral source rule. The court gave as additional reasons for its decision the lack of certainty that public resources would remain available for as long as plaintiffs need them and the fact that many public benefits hinge upon a plaintiff's continued indigence. *Id.* 361 S.E.2d at 738–39.

In *Florida Physician's Insurance Reciprocal v. Stanley*, 452 So.2d 514, 515–16 (Fla. 1984), the Florida Supreme Court determined that the collateral source rule should not be applied to public school benefits. The court stated,

[T]he policy behind the collateral source rule simply is not applicable if the plaintiff has incurred no expense, obligation, or liability in obtaining the services for which he seeks compensation. This is further made apparent upon comparison of the present case with a situation in which the collateral source rule is frequently applied, that of the defendant who seeks a reduction in damages because the plaintiff has received insurance benefits. "It is a well-settled rule of damages that the amount recoverable for tortious personal injuries is not decreased by the fact that the injured party has been wholly or partly indemnified for the loss by proceeds from accident insurance where the tortfeasor did not contribute to the payment of the premiums of such insurance. This rule is usually justi-

fied on the basis that the wrongdoer should not benefit from the expenditures made by the injured party in procuring the insurance coverage." [Emphasis omitted.] (22 Am.Jur.2d Damages sec. 210, at 293–94 (1965).) In a situation in which the injured party incurs no expense, obligation, or liability, we see no justification for applying the [Collateral Source] rule. We refuse to join those courts which, without consideration of the facts of each case, blindly adhere to "the collateral source rule, permitting the plaintiff to exceed compensatory limits in the interest of insuring an impact upon the defendant." (Note, *Unreason in the Law of Damages: The Collateral Source Rule*, 77 Harv.L.Rev. 741, 742 (1964)....

*Id.* (quoting *Peterson v. Lou Bachrodt Chevrolet Co.*, 76 Ill.2d 353, 29 Ill.Dec. 444, 448, 392 N.E.2d 1, 5 (Ill.1979)). We agree with the result of the Florida decision.

Here, plaintiffs need not purchase the public school benefits, nor work for them as an employment benefit, nor contract for them. Hence, the "benefit of the bargain" rationale does not apply. Nor are these benefits provided as a gift by a friend or family member to assist plaintiffs specifically, such that it would be inequitable to transfer the value of the benefit from plaintiffs to defendants. Nor is this a benefit that is dependent upon plaintiff's indigence or other special status. Instead, public school programming is available to all by law. While to some extent public schools are funded by plaintiffs' tax dollars, they are also funded by defendants' tax dollars and no windfall results to either. We reject the concept that the collateral source rule should be utilized solely to punish the defendant. Damages in our tort system are compensatory not punitive.

We hold that it was reversible error for the trial court to exclude evidence of the free public school programming that would be available to plaintiffs to mitigate their damage. The various rationales that support the applications of the collateral source rule in a number of other circumstances are not persuasive here. Plaintiffs, of course, may respond to this evidence with arguments of its inadequacy, the risk of its continued availability, etc.

**B.**

■ A second justification for the admission of this mitigation evidence also existed. Plaintiffs opened the door to this issue by injecting testimony of Ms. Washington's financial condition into the case. During both direct examination and cross-examination, one of plaintiffs' damage experts, Mr. Alan Spector, repeatedly referred to Ms. Washington's financial need. He implied that Ms. Washington could afford neither a car nor a wheelchair. He volunteered that she had moved for financial reasons, and that medical insurance was very difficult for persons with disabilities to obtain.

In *Moore v. Missouri Pacific Railroad Company*, 825 S.W.2d 839, 841–42 (Mo. banc 1992), the plaintiff volunteered in a nonresponsive answer during cross-examination that he had been unable to continue therapy because he had no money. The trial court then permitted defense counsel to inquire as to his receipt of collateral source payments. This Court held that there is an exception to the general collateral source rule of inadmissibility where a plaintiff voluntarily injects his financial condition. *Id.* at 842–43. "Whether the plaintiff injects his financial condition through inadvertence or purposefully, it is the raising of plaintiff's financial condition with the jury that permits the opposing party to attack his claims of financial distress by showing that other financial assistance was available." *Id.* at 843. Although in this case plaintiff's expert, not plaintiff, injected plaintiff's financial condition into evidence, the effect on the jury was the same.

Before cross-examining Mr. Spector, defense counsel cited *Moore* to the court, asserting Mr. Spector's remarks during direct examination opened the door for cross-examination regarding the availability of free public special education. Plaintiffs' counsel stated that *Moore* was distinguishable, and the court denied defense counsel's request. In *Moore*, this Court stated that the permissible scope of cross-examination is left within the discretion of the trial court, which would only be reversed upon an abuse of discretion. 825

S.W.2d at 843. Here, it is apparent that such an abuse of discretion occurred. In *Moore,* plaintiff's injection of his financial condition occurred only once and seemed inadvertent. In the present case, Mr. Spector injected Ms. Washington's financial condition at least four times.[3]

### IV.

■ Defendants raise three other issues which they claim entitle them to a new trial. First, defendants claim they should have been granted a continuance during voir dire until Corey Washington was available to attend the trial. Corey was apparently ill during the first day of trial and defendants wanted to have Corey present so they could voir dire the jury panel about their ability to render a verdict unaffected by sympathy after seeing Corey. Defendants had not subpoenaed Corey nor had they obtained the agreement of plaintiffs' counsel to produce Corey during voir dire, nor had they obtained any order from the court concerning his attendance. In this circumstance, we do not find that the court abused its discretion in denying the request for continuance.

■ Defendants also claim that the trial court erred in denying them the opportunity to question Dr. Corteville about two medical articles she wrote. While Dr. Corteville was allowed to testify that she authored the articles and that one was published in the American Journal of Obstetrics and Gynecology, she was not allowed to testify further as a sanction for her failure to supplement prior interrogatory answers to include information about these articles.

In *Gassen v. Woy,* 785 S.W.2d 601, 604 (Mo.App.1990), the western district stated:

> We conclude that the rules and the case law establish a principle that when an expert witness has been deposed and he later changes his opinion before trial or bases that opinion on new or different facts from those disclosed in the deposition, it is the duty of the party intending to use the expert witness to disclose that new infor-

mation to his adversary, thereby updating the responses made in the deposition.

In the present case where Dr. Corteville testified both as a party and an expert we believe this principle applied to her so that she was required to supplement her prior interrogatory answers if she intended to use the newly written articles to bolster her testimony. While exclusion of further testimony from Dr. Corteville was not the only sanction available, such determinations, especially when they arise during trial, are best left to the discretion of the trial judge. We find no abuse of discretion here.

■ Finally, defendants claim that the verdict should have been rejected because it was the result of bias, passion and prejudice. Defendants base this argument primarily upon the size of the verdict given to the plaintiffs. In light of the overwhelming injuries suffered by Corey Washington we cannot find that the jury exceeded its broad discretion in this area. *See Seabaugh v. Milde Farms, Inc.,* 816 S.W.2d 202 (Mo. banc 1991); *Graeff v. Baptist Temple of Springfield,* 576 S.W.2d 291 (Mo. banc 1978).

### V.

We affirm the judgment of the trial court as to the issue of liability and we reverse the judgment of the trial court as to the issue of damages and remand the case for a new trial of that issue.

All concur.

---

**3.** Defendants also raise five other issues (Points IV, V, VI, VII, and IX) as to damages. Because of our ruling on the collateral source issue, we need not address the other issues.