Larry Dean GILLHAM and Willa Jean
Gillham, Plaintiffs–Respondents,

v.

Don LaRUE, d/b/a LaRue
Construction, Defendant–
Appellant.

No. 25491.

Missouri Court of Appeals,
Southern District,
Division One.

June 22, 2004.

---

C. Bradley Tuck, Tuck & Lukachick, P.C., Springfield, for appellant.

Jennifer A. Mueller, Blackwell Sanders Peper Martin, LLP, Springfield, for respondent.

PHILLIP R. GARRISON, Judge.

Larry Dean Gillham ("Gillham") and Willa Jean Gillham (collectively referred to as "Plaintiffs") filed suit against Don La-Rue, d/b/a LaRue Construction ("Defendant") claiming damages as a result of the installation of a metal roof on their home. Defendant appeals a judgment entered in favor of Plaintiffs after a trial to the court. We affirm.

Defendant was in the business of installing metal roofs manufactured by VicWest Steel ("VicWest"). In early 1998, Plaintiffs contacted him concerning the possibility of replacing the shake roof on their home with a metal one, because their existing roof was "nearing [the] end of its service life." At that point, Plaintiffs had experienced no leaks in their roof except for one at the rear of a detached garage. Defendant visited Plaintiffs' home, took measurements and later submitted a bid to do the work. The bid, which was accepted by Plaintiffs, was for a price of $25,416 for a standing seam metal roof. Included in the bid was new flashing.

The saga of Plaintiffs' problems with the new roof is too extensive to fully describe in this opinion. Suffice it to say that they experienced numerous leaks in the house each time it rained. For instance, sky lights in the house leaked each time it rained after the new roof was installed. Over time, leaks appeared in many rooms of Plaintiffs' home, sometimes even coming through light fixtures in the ceilings. Plaintiffs would call Jesse Simmons ("Simmons"), Defendant's foreman on this job, each time they had leaks. For a period of time, Simmons or other of Defendant's employees would come to Plaintiffs' home to investigate the leaks, telling Plaintiffs that they thought they had fixed the problem. The leaks continued, however, the next time it would rain. Plaintiffs even furnished Simmons with documents they obtained from Andersen Windows explaining how to seal around skylights. Simmons indicated he would obtain the materials to correct the leaks around the skylights, but never did.

Gillham testified that he had not talked with or been able to reach Defendant since September 11, 1998, the day Defendant picked up the final payment for the job. Finally, in January of 2000, Gillham sent a registered letter to Defendant outlining the fact that the ceilings in five rooms of the house, plus the garage ceiling, had been damaged by leaks; that Simmons had been to the house many times and had eventually repaired the garage roof by replacing metal panels that they said were improperly installed; and describing their unsuccessful attempts to contact Defendant and get the leaks repaired. A few days later, Simmons and his brother ap-

peared at Plaintiffs' home and promised to come back the next day to work on the leaks, but did not do so. Plaintiffs continued to have leaks when it would rain, sometimes with water standing in light fixtures. On March 26, 2000 there were leaks in the living room for the first time. In fact, at that time, the water was coming down through light fixtures in the ceiling. Plaintiffs were able to reach Simmons after that rain by using a phone not listed in their names. Simmons did come out on that occasion, and found that panels of the metal roof had slid down into the gutter. Instead of taking the panels off and reinstalling them, Simmons tried to reposition them by hammering them back into place from the bottom. There was still a gap at the top of those panels, which Simmons covered with "tape and mastic." That apparently was the last time either of the Plaintiffs were able to reach Simmons although they attempted to call he and Defendant many times thereafter. At the time of trial, Plaintiffs were still using plastic in an attempt to protect the interior of their house when it rained.

Plaintiffs' suit was based on breach of contract and negligence. Other evidence, as it relates to the issues on this appeal, will be discussed in the body of this opinion. The trial court found that Defendant breached his contractual obligations by failing to install flashing, and was negligent by failing to install the roof in a workmanlike manner. The court also found that the roof could not be repaired in a way that would leave the finished product aesthetically pleasing; that Plaintiffs presented evidence that the diminution of value of the property with the defective roof was $64,000; that the cost of repairing the roof by replacement would

be $65,300; that Defendant presented no evidence of what it would cost to repair the roof by replacing it; that replacing the roof panels is the only way it can be repaired to stop leaks and also leave it aesthetically pleasing; and, that since the measure of damages is the lesser of the cost of repair (by replacement in this case), or the diminution of value of the property, it entered judgment for $64,000. In doing so, the trial court said that while it found it difficult to believe that the cost of replacing the roof would exceed the original contract price by almost $40,000, there was no competent evidence upon which to award a lesser amount.

Our review of a court-tried case is governed by Rule 84.13(d)(3)[1] and *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976). *Delgado v. Mitchell*, 55 S.W.3d 508, 511 (Mo.App. S.D.2001). Accordingly, we will affirm the judgment of the trial court unless there is no evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law. *Id.* at 511–512.

■ Defendant's first point on appeal asserts trial court error in entering judgment for $64,000 as an award for diminution of value because the only witness giving an opinion as to that valuation testified that this amount included both roof repairs and the finishing or remodeling of a bathroom in the home. Defendant argues that the only negligence or breach of contract claimed by Plaintiffs related solely to the replacement of the roof and the contract did not include finishing or remodeling a bathroom.

Defendant points out that the testimony relating to diminution of value was by Robert Kollmeier ("Kollmeier"), who testi-

---

1. All references to rules are to Missouri Rules of Civil Procedure (2003) unless otherwise indicated.

fied for Plaintiffs. Kollmeier testified that the property had a fair market value, in its current condition, of $105,000, and $169,000 "if repairs were made." He said that his opinion of damage was the difference of those two figures ($64,000) if the repairs were made. He said there was damage within the interior and to the exterior of the residence, and that "there was some unfinished remodeling" that was a part of his opinion. On cross-examination, Kollmeier said that his value opinion of $169,000 was based upon repairs to the roof being made and "the minor remodeling" involving a bathroom.

Defendant neither objected to any of this testimony nor asked that it be stricken, but now argues that the judgment for $64,000 for diminution in value was against the weight of the evidence and was not supported by substantial evidence. Defendant does not mention the fact, either in his statement of facts or argument sections of his brief, that Kollmeier's report was introduced with the statement from Defendant's counsel that he had "[n]o objection." That report contained Kollmeier's opinion that the home "in its present condition, would be impossible to achieve fair market value due to the extensive roof repairs needed," and that "[u]ntil these repairs are completed the seller cannot complete their remodeling, repair interior damage caused by roof leakage, or make satisfactory disclosures with regard to real estate listing standards." Kollmeier's report also contained an opinion of current value of $105,000 and a fair market value after repairs of $169,000. Although the report does not specifically so state, it could be interpreted as saying that the "repairs" necessary to achieve a fair market value of $169,000 were those to the roof.

The only case relied on by Defendant under this point, other than those relating to the general standard of review in court-tried cases, is this court's decision in *Delgado*. There, respondent obtained a judgment for damage to a full-sized antique railroad train he stored on appellant's property on the theory that appellant breached an agreement to put the train engine on blocks and secure the train from vandals, the elements and other potential hazards. *Id.* at 508. The only evidence of damage came from respondent's testimony in which he said that he sustained damage of $50,000 for each of three units of the train. *Id.* at 511. He conceded, however, that since he had not seen inside one of them, his opinion was based on his observations of the other two, but that he had not gone inside even those, but had only peered through a broken door window on one, and through a boarded up window of another. *Id.* We reversed based upon appellant's point that respondent did not meet his burden of proving the existence of damages with "reasonable certainty." *Id.* at 512. In doing so, we said that a party claiming damages for breach of contract bears the burden of proving the existence and amount of damages with reasonable certainty, or stated otherwise, proof of actual facts which present a basis for a rational estimate of damages without resorting to speculation. *Id.* Defendant here, also latches onto language from *Delgado* that it would be plainly unjust "to compel a party to pay damages for something that may or may not have resulted and which are merely problematical or were not caused by the breach of contract." *Id.*

*Delgado* is not controlling here. The cases are factually distinguishable, and it is not apparent in *Delgado* whether or not there was an objection to the testimony. In the instant case, Defendant specifically announced "[n]o objection" when Kollmeier's report was offered into evidence. Additionally, he failed to object to Kollmeier's trial testimony or, after cross-examination,

request that his opinion testimony be stricken. We also note that, although he was not required to do so by Rule 73.01(d) in this court-tried case, Defendant filed a motion for new trial. In that motion, Defendant failed to bring the matter of Kollmeier's opinion testimony to the court's attention. In all, Defendant did nothing to bring this contention to the trial court's attention in order that it might consider the matter and make appropriate rulings.

■ If a question exists as to whether a proffered opinion by an expert is supported by a sufficient foundation, the question is one of admissibility and must be raised by a timely objection or motion to strike. *Washington By Washington v. Barnes Hosp.*, 897 S.W.2d 611, 616 (Mo. banc 1995). Citing *Seabaugh v. Milde Farms, Inc.*, 816 S.W.2d 202, 209 (Mo. banc 1991), the *Washington* court said that an objection or motion to strike is untimely if it comes too late to give opposing counsel an opportunity to correct any deficiencies in the question or foundation. *Id.* To hold otherwise would encourage "sandbagging" and delay resolution of problems that might be correctable with a few questions, until a time where the expense and burden of a new trial would be involved. *Id.*

■ In *St. Joseph Light and Power Co. v. Kaw Valley Tunneling*, 589 S.W.2d 260 (Mo. banc 1979), a court-tried case, there was a contention that a witness' opinion on the fair market value of a building, based on a capitalization of income approach, did not take into account various considerations and factors such as a discount factor, taxes, insurance and other expenses. In denying that contention, the appellate court held that no objection was made at trial to the opinion on that basis, and "will not be considered when raised for the first time on appeal." *Id.* at 269. An appellate court will not convict a trial court of error

on an issue which was not put before it to decide. *State ex rel. Selby v. Day*, 929 S.W.2d 286, 288 (Mo.App. S.D.1996). Therefore, this point is denied.

Defendant's second point is that the trial court erred by "alternatively" holding that the roof needed to be replaced at a cost of $65,300 because that conclusion was not supported by the evidence, is against the weight of the evidence, and constitutes an erroneous declaration or application of the law. In support, he argues that George Edgar McDaniel ("McDaniel") was the only witness called by Plaintiffs who testified that it would cost $65,300 to replace the roof, but he also testified that it could be repaired for $6,000 and still be functional. Defendant argues that this testimony was inconsistent, contradictory and self-defeating. He also contends under this point that the testimony of another of Plaintiffs' experts, Scott Stowell ("Stowell") "lacked credibility to offer any testimony as to either the repair or replacement of the roof," and another expert, Isiah Earl Jackson ("Jackson") gave no testimony as to whether repair or replacement of the roof was required.

■ Again, other than *Murphy* cited for the standard of review, the only case relied on by Defendant in support of this point is *Delgado*. Defendant argues that McDaniel's testimony was a "moving target" and that because of the "inconsistency, contradictory and self-defeating nature of [McDaniel's] testimony, plaintiffs fail to submit 'proof of the existence and amount of damages with reasonable certainty' as required by *Delgado*." A review of McDaniel's entire testimony belies that contention.

■ First, it should be noted that Rule 84.04(c) requires that the statement of facts in an appellate brief be a "fair and concise statement of the facts relevant to

the questions presented for determination." A party's statement of facts that sets forth facts favorable to him, but omits facts supporting the trial court's ruling or that support a different conclusion does not substantially comply with Rule 84.04(c). *Watson v. Moore,* 8 S.W.3d 909, 911 n. 4 (Mo.App. S.D.2000). Here, Defendant cites us to only portions of McDaniel's testimony which he considers to be supportive of the theory he propounds in this point. Though we would be justified in not considering this portion of the point, we do not apply that sanction out of a desire to decide cases on the merits where possible.

Defendant argues that McDaniel first authored a report saying that the roof could be repaired for $6,000. Then he says that McDaniel later submitted a bid to Plaintiffs to remove and replace the roof for $65,300. Finally, Defendant points out that McDaniel testified at trial that the roof would be fully functional if repaired, but some of the coloration would not match. From these portions of McDaniel's testimony, Defendant concludes that it was inconsistent, contradictory and self-defeating.

In support of his contention that McDaniel lacked credibility, Defendant argues that "he did not know what he was talking about." Defendant draws this conclusion based on excerpts from McDaniel's testimony. Defendant points out that McDaniel said that he did not know what "brand" the roof was; he had never participated in the actual installation or repair of a residential metal standing seam roof; it had been ten years since he had physically installed a metal standing seam roof; the manufacturing process for metal standing seam roofs has changed in the last ten years; and he had attended no continuing education or seminars to keep up with the changes in the installation and types of metal standing seam roofs. Additionally, Defendant points out that McDaniel had never had any personal involvement in installing a VicWest metal standing seam roof; had no training on installing that kind of roof; and had never reviewed the documentation with regard to the installation of a VicWest metal standing seam roof.

Defendant's contention is undermined by a review of McDaniel's full testimony. McDaniel is a sheet metal worker who has been working with metal roofs for twenty-five to thirty years "[t]roubleshooting, estimating, and coordination of men to get the job done." While Defendant highlights McDaniel's statement that the roof could be repaired for $6,000, McDaniel's report was prepared after he first inspected the roof in the fall of 2000. In that report, he concluded that the roof "has problems at the ridge, skylights, and the counter flashings," and that "[t]he work [was] terrible." He said that the "approximate cost to repair these places would be around [$6,000]." That report also said that "the valleys will start to leak in three to five years because they are put together with screws instead of mechanically flashed." McDaniel's bid to replace the roof for $65,300 followed a second inspection of the roof in June 2002. He testified that he now believes the roof must be replaced because of discoloration of the metal that occurred over time, and if not replaced it was going to look like a patched job. While McDaniel testified that the repaired roof would be "functional," the trial court found that a roof on a home must not only prevent rain from coming inside the structure, but must also be aesthetically pleasing; that aesthetic beauty was one of the primary reasons this type of roof was selected by Plaintiffs; that any repair of this roof must be accomplished in a way that would leave the roof aesthetically pleasing; and, that replacing the roof is the only way

it could be repaired to stop the leaks and also leave it in an aesthetically pleasing condition. This finding was consistent with McDaniel's testimony that he believed the roof should be replaced "because of the discoloration of the metal" and that it could be patched "[b]ut that's what's going to show up real bad now."

While Defendant established on cross-examination of McDaniel that he had never reviewed the "documentation with regard to the installation of a VicWest standing seam metal roof," examination of the record reveals that Defendant's counsel produced a copy of what he described as VicWest's Batten Standing Seam Roofing Systems Manual for McDaniel's review. After reviewing this manual on VicWest roofs, McDaniel testified that it was no different than the guidelines that he usually works with and that it, in fact, substantiated his opinions about deficiencies in the manner in which this roof was installed.

McDaniel also testified at length about the problems he found with this roof. For instance, he found that the roof was "left wide open" because there was no counter-flashing where the roof met an upright wall; there was an opening of one-fourth to three-eights of an inch where the hips join up; there were openings where the ridges run to an existing wall of one-fourth to three-eights of an inch; and there were no diverters or crickets on the uphill side of the skylights. He also said that in some locations where the counterflashing had been left off, caulk had been used in an attempt to make the roof water tight. Additionally, he said that parts of the metal panels had slid down as much as three inches, being stopped by the gutter, and there was a corresponding three-inch gap at the top. He also found that at the ridges, "closure pieces are installed backwards, which means the screws are out on the outside in the weather instead of turned to the underneath side of the flashing." These and other examples led to McDaniel's opinion that this roof was not installed in a workmanlike manner.

▪ Taking McDaniel's testimony in context and as a whole, we do not find that it was inconsistent, contradictory or self-defeating as described by Defendant. What Defendant really questions here is McDaniel's credibility when viewed in the vacuum of Defendant's selected excerpts from his cross-examination of the witness. As indicated above, however, that hardly provides a fair review of this witness's testimony. Nevertheless, and certainly in this case, credibility is a matter for the trier of fact. In court-tried cases considerable deference is given to judgments which turn on evidentiary and factual evaluations by the trial court. *In re Marriage of Fry*, 827 S.W.2d 772, 775–76 (Mo.App. S.D. 1992). It is the function of the trial court to decide the weight and value to be given to the testimony of witnesses. *In re Estate of Campbell*, 939 S.W.2d 558, 564 (Mo. App. S.D.1997). As the trier of fact, the trial court is in a better position to determine the credibility of witnesses, their sincerity, character, and other trial intangibles which may not be shown by the record. *Id.* It may believe all, part or none of the testimony of any witness. *Id.* These principles apply here. The trial court was not required to believe testimony presented by or relied on by Defendant. Certainly, *Delgado* does not require a reversal. This portion of Defendant's point is denied.

▪ Defendant also complains in this point that Plaintiffs' witness Scott Stowell ("Stowell") "lacked credibility to offer any testimony as to either the repair or replacement of the roof." This portion of Defendant's point relied on violates Rule 84.04(d)(1)(c) by failing to "explain why the legal reasons, in the context of [this] case,

support the claim of reversible error." As provided in Rule 84.04(d)(4) "[a]bstract statements of law, standing alone, do not comply with this rule." It is not enough for a point relied on to simply state that the trial court was wrong without alluding to some evidence or testimony that gives support to such a conclusion. *Brady v. Rossotti*, 80 S.W.3d 927, 930 (Mo.App. S.D. 2002). "An insufficient point relied on in an appellant's brief preserves nothing for appellate review." *Id.* (quoting *Estate of Phillips v. Matney*, 40 S.W.3d 15, 18 (Mo. App. S.D.2001)). Accordingly, we will not review this portion of the point.

■■■ Finally, Defendant complains in this point that the trial court's judgment that the roof needed to be replaced at a cost of $65,300 was not supported by the evidence, is against the weight of the evidence and constitutes an erroneous declaration or application of the law because "Plaintiffs' witness Jackson offered *no* testimony as to whether the repair or replacement of the roof on the [Plaintiffs'] home was required." Although, in light of what was said above with reference to McDaniel's testimony, there was sufficient evidence to support the trial court's judgment, thereby making this portion of the point moot, we are compelled to point out some of the testimony given by Jackson.

The argument portion of Defendant's brief with reference to this witness covers a half page. He argues that Jackson gave no opinion about whether the roof should be repaired or replaced. Not included in Defendant's brief, however, are other portions of Jackson's testimony that are significant here. Jackson was a "field technician" for one of VicWest's sister companies, and indirectly worked for the parent company that owned VicWest and other related companies. As such, Jackson "investigate[d] field issues with installation, assist[ed] customers in installation

issues, [did] warranty inspections, [and] claim resolutions." His experience included having inspected at least 100 roofs. Of interest here is the fact that he testified that there was nothing about the VicWest roof that required special training as an inspector because "it's pretty much a standard type of detail package that's used, I'd say, throughout the industry." In this particular instance, he was sent to Plaintiffs' home by the manager of field services for the parent company of VicWest and he inspected the installation of this roof. He described numerous deficiencies in Defendant's installation of the roof in question, including the lack of flashing, the fact that sheets of the metal slid down the roof, the inappropriate use of fasteners, and others. He described Plaintiffs' roof as having a "poor" appearance "[b]ecause it looks very bad," and rated it as a "1" on a "scale of 1 to 10," with "1" being the worst. In short, Jackson may not have expressed an opinion about what should be done, but he certainly testified to causation for the necessity of either repair or replacement. Defendant's second point is without merit and is denied.

Defendant's third point relied on is multifaceted and diverse. It is:

The trial court erred in entering judgment against [Defendant] in the amount of $64,000 for diminution of value to [Plaintiffs' home], and by alternatively holding the roof needed replacement at a cost of $65,300 because the evidence and the court's holding in the judgment that "the court finds it difficult to believe that the cost of replacing the roof would exceed the original contract price by almost $40,000, but has no competent evidence upon which to base an award of a lesser amount," fails to address other competent evidence before the court concerning the measure of any claim of

damages for the roof in that (A) [Gillham] and [Defendant] entered into an original contract to remove the existing shake roof and replace it with a metal roof for $25,416; (B) Plaintiffs' expert [McDaniel], by letter report dated October 8th, 2000, presented evidence the roof could be repaired for $6,000; (C) that [Defendant's] foreman on the project, [Simmons], testified the necessary repairs would cost $2,000—$3,000; (D) that [Defendant], at all times during the roofing, wanted to install end wall flashing, and still could install end wall flashing to the roofing project; and (E) the only evidence of necessary repair to the roof during the two year warranty period concerned repairs only, not replacement of the roof.

In its judgment the trial court concluded that the measure of damages is the lesser of the cost of repair (which in this case would require replacement of the roof in order to be aesthetically pleasing) or the diminution of value of the property. It then entered judgment for Plaintiffs for $64,000 after finding that Plaintiffs' evidence was that the diminution in value was $64,000 and the cost of repair by replacement was $65,300; that Defendant's evidence that the cost of repair was between $2,000 and $6,000 did not include replacing the roof; and Defendant presented no evidence of what it would cost to replace the roof. In doing so, the trial court found "it difficult to believe that the cost of replacing the roof would exceed the original contract price by almost $40,000, but has no competent evidence upon which to base an award of a lesser amount."

As we interpret this point, Defendant attacks the finding that there was no competent evidence that the roof could be repaired for less than $65,300. In doing so, he argues that the trial court's finding that it found it difficult to believe that the cost of replacing the roof would exceed the original contract price by almost $40,000 but had no competent evidence upon which to base an award of a lesser amount, was "[t]roubling" to "both parties, and apparently the trial court."

Defendant first points to the fact that the contract between he and Plaintiffs for removal of the original shake roof and replacement with the metal roof was in the amount of $25,416 was in evidence. That contract was, in fact, referred to by the trial court in making the finding Defendant now complains of, but it was dated May 26, 1998, and this case was tried in October 2002. We are directed to no evidence about how the cost of replacing the shake roof with a metal roof four years earlier would compare to the reasonable cost of replacing the metal roof with another one as of the time of trial. Implicit in Defendant's argument is the contention that the trial court was required to believe that Plaintiffs' could get the roof replaced for less than $65,300. It had the original contract before it, and obviously did not believe that it established what the cost of replacement would be. Certainly, the trial court was entitled to believe that for the amount of the contract with Defendant, Plaintiffs' received what Jackson described as a roof, that on a "scale of 1 to 10" (with "1" being the worst), was a "1." Finally, Defendant cites no authority in support of this particular argument under this point.

Next, Defendant argues that McDaniel's report in October 2000 said the roof could be repaired for $6,000, and that Defendant's foreman on the project, Simmons testified repairs would cost $2,000 to $3,000. This argument ignores the conclusion of the trial court that this roof could not be repaired so as to be *both* functional and aesthetically pleasing without being replaced, a conclusion that is not attacked on this appeal. In fact, while McDaniel

initially thought the roof could be repaired for "around" $6,000, on his later inspection, he thought that the roof needed to be replaced, and he said that would cost $65,300. Defendant also ignores the axiomatic principle referred to earlier that the trial court was not required to believe the testimony of Simmons or any other witness.

Defendant also argues that there was evidence that he wanted to install end wall flashing on Plaintiffs' roof, but that Plaintiffs did not want to do so because it would involve removing shakes that were on the vertical walls joining the roof. This ignores the fact that Gillham directly contradicted that contention, and since credibility is for the trier of fact, the trial court was not required to believe Defendant's version. Additionally, this contention ignores the significant evidence that the flashing at the end walls was only part of the problem with this roof, and its correction would not avoid the patched appearance that would result from repairing the other problems on the roof.

Finally, Defendant argues that "the only evidence of necessary repair to the roof during the two-year warranty period concerned repairs only, not replacement of the roof." In support, Defendant argues that during that two-year period, the only evidence of necessary repairs was McDaniel's report that repairs would cost "around" $6,000; Simmons testified the repairs would cost $2,000 to $3,000; and that Defendant himself testified that the end wall flashing could be installed simply by removing the shingles on the vertical wall and inserting the flashing. As we discern his contention under this portion of the point, an alleged two-year warranty would

have limited the time period during which the *cost of repairs* could be determined.

■ Defendant directs us to no evidentiary support that there was a two-year warranty on this job.[2] Additionally, he cites no authority for his implicit proposition that the damages for which a judgment may be entered against him for negligence or breach of contract is limited to those for which an opinion was expressed within the alleged two-year warranty period. Failure to cite relevant authority where available, or to set forth why such authority is not available, constitutes an abandonment of the point under Rule 84.04(d). *Williams v. Belgrade State Bank,* 953 S.W.2d 187, 190 (Mo.App. S.D. 1997). This point is without merit and is denied.

In his fourth and final point, Defendant contends that the trial court erred in finding against him on the theory that (1) he breached his contract by failing to install flashing, and (2) he was negligent by failing to install Plaintiffs' roof in a workmanlike manner. He argues that the evidence shows that Gillham made the final decision that the end wall flashing was not to be used. He also contends that the finding in favor of Plaintiffs is against the weight of the evidence and erroneously declares and applies the law in that (1) Defendant compromised the terms and conditions of the contract by failing to install the end flashing at the express direction of Gillham; (2) Gillham would not give his approval to remove the shakes on the end wall and permit the end wall flashing to be installed; (3) Gillham negotiated and received fair compensation for the value of the flashing which he instructed not be installed; and (4) Defendant cannot be found in breach of contract or negligent in his failure to complete the original contract when

2. We note from our own review of the record that "2 years" was handwritten on the top of Defendant's bid to do this job for $25,416.

Gillham testified that he wrote that on the bid based upon what Defendant orally told him.

the owner of the property gives specific instructions not to install the end wall flashing.

 This point is not well taken for several reasons. The trial court found against Defendant on the theory of breach of contract by failing to install flashing, and also on negligence for failing to install the roof in a workmanlike manner. Defendant's point attacks the trial court's conclusion that he failed to install the flashing, arguing that the evidence established that Gillham made a decision not to have the end wall flashing installed. This ignores the trial court's role as the finder of fact and its responsibility to make credibility determinations. As has been pointed out several times earlier, the trial court is free to believe none, part or all of a witness's testimony. Both Plaintiffs denied that they instructed Defendant to not install new flashing when the roof was installed, in fact, both said it was called for in the contract and they believed it would be installed.

Additionally, the evidence documented numerous deficiencies in the roof other than the absence of flashing. The finding against Defendant was not, as intimated in this point, solely on the basis of a failure to install flashing. The record is replete with other examples of why this roof was not installed in a workmanlike manner. The trial court clearly concluded that because of the problems with the roof, other than the flashing alone, it could only be repaired in a acceptable manner by being replaced. This point is denied.

The judgment of the trial court is affirmed.

BARNEY, P.J., and PREWITT, J., concur.