Ali Naji **IBRAHIM,** Appellant,

v.

Sharon Louise **IBRAHIM,** Respondent.

No. 17395.

Missouri Court of Appeals,
Southern District,
Division One.

March 4, 1992.

---

Lee Ann Miller, Woolsey, Fisher, Whiteaker & McDonald, Springfield, for appellant.

Rick Jackson, Jayne, Steele and Jackson, Kirksville, for respondent.

PARRISH, Judge.

Ali Naji Ibrahim (husband) appeals the custody award and the visitation award, the division of marital property, and the award of attorney fees made by the trial court in this dissolution of marriage case. The trial court entered its judgment and decree January 10, 1991, dissolving the marriage. The trial court awarded Sharon Louise Ibrahim (wife) legal and physical custody of the child of the parties, Naji Ali Ibrahim (Naji), who was six years old at the time the decree was entered. Husband was allowed "reasonable visitation rights with the Child." Husband was ordered to pay child support in the amount of $200 per month, payable in $100 installments on the 1st and 15th of each month, retroactive to the 1st of September, 1990. The trial court ordered husband to pay attorney fees and suit money for wife in the amount of $2,000. It set over certain nonmarital property to wife and awarded items of marital property that were in each party's possession to that party. Judgment in the amount of $5,000 was entered for wife, against husband "to cause the distribution of Marital Property to be fair and just." This court affirms.

■ Being court-tried, this case is reviewable in the manner prescribed by Rule 73.01(c). "As that rule is interpreted, the judgment is to be affirmed unless there is no substantial evidence to support it, it is against the weight of the evidence, it erroneously declares the law, or erroneously applies the law." *Four Seasons Lakesites Property Owners Ass'n, Inc. v. Dungan,* 803 S.W.2d 173, 174 (Mo.App.1991). As explained in *Buchheit v. Buchheit,* 768 S.W.2d 641 (Mo.App.1989), at l. c. 642:

> When there is a conflict in the evidence, the trial court determines the credibility of the witnesses. *Ware v. Ware,* 647 S.W.2d 582, 584 (Mo.App.1983). The judgment of the trial court is to be affirmed under any reasonable theory supported by the evidence. *Id.* Deference is accorded the trial judge even if there is evidence which might support a different conclusion. *Id.*

The burden of demonstrating error belongs to the party challenging the trial court's decree. *Calia v. Calia,* 624 S.W.2d 870, 872 (Mo.App.1981); *Naeger v. Naeger,* 542 S.W.2d 344, 346 (Mo.App.1976). Findings of fact were not requested nor made. All fact issues are, therefore, considered as having been found by the trial court in accordance with the result it reached. Rule 73.01(a)(2); *Nelson v. Baker,* 776 S.W.2d 52, 53 (Mo.App.1989).

The parties were married March 18, 1982. Naji was born on June 24, 1984. There were tumultuous periods during the more than eight years when the parties were married. The parties had at least two prior separations—on one occasion, in 1988, a petition for dissolution of marriage had been filed. At times, husband had been violent and abusive. He hit wife. On one occasion, he blackened both of her eyes. He cursed her and forced her to do things against her will. He locked her out of their house. Several times he threatened to kill her if she did not cooperate with him and obey him. He cursed Naji. He would tell Naji to call wife vile names. On an occasion in 1989, while the parties were separated, husband traveled from Springfield, Missouri, where he resided, to Kirksville, Missouri, where wife resided with Naji, and took Naji away from her without her knowledge or consent. Husband took Naji

to Springfield. Wife testified that she "was on the phone just about every other day or every day" to try to keep in touch. She was asked what Naji said to her on an occasion shortly after he was taken from her. She testified, without objection:

> Naji told me: Mommy, get down here quick and get me, I'm at Max's mom's and daddy said he's got a gun and he's going to kill you. And then Ali took the phone away from him and Naji begged Ali to let me talk. And Naji was scared, I could tell he was scared by the way his voice quivered.

There was testimony that husband had made sexual advances toward a friend of wife's on an occasion when the friend stayed at an apartment the parties occupied. The friend, Carol Wangler, worked with wife at a restaurant. She resided for a short time, "pretty close to a month," with the parties at their apartment. She was there in January 1990, when the parties separated—when wife left. Ms. Wangler testified about what occurred when husband returned to the apartment and learned that wife was gone. She testified:

A. ... So Max left, and Ali came and he was mad. He was in the van because he was working at Howard Johnson's then, and he was in the work van. And I was sitting on the couch, and he come in. And I was going to go to sleep, and he told me to go get in the bed, and I did. And he walked in and put his hand on my leg, and I got up and walked out of the bedroom.

Q. As he put his hand on your leg, though, did he say anything to you?

A. Yeah, he said, you know you want to. And then I said no and pushed his hand and got up and walked out of the room. And then he got mad, he said he had to take the van back to work and that he would be back. And then within the time that he was gone I got my stuff, the stuff that I could get, and left, had Terry come and get me.

Q. Terry is a friend of yours?

A. Terry is my boyfriend, now.

Q. And that's the last time you had stayed in the Ibrahim apartment?

A. Yes.

Husband abused wife's eight-year old niece. The niece testified at trial, as follows:

Q. And Dawn, have you ever had any sexual contact whatsoever with Ali Ibrahim?

A. Yes.

Q. And first of all, would you tell the Judge your approximate age when that incident occurred?

A. I was eight years old.

Q. And you are now seventeen?

A. Yes.

. . . . .

Q. Okay. And what happened after Sandy, your mother, had left the house?

A. He asked us if we wanted to—we were just all playing, he asked us if we wanted to play a game, he called this a game of hospital. At first all three of us were playing around.

Q. Where were you playing the game at first?

A. In the bedroom.

Q. In Ali's bedroom?

A. Yes, all in one floor. It was like a kitchen, and then they had a bedroom separated from the kitchen.

. . . . .

Q. Okay. And your brother and Amanda went upstairs with the roommates?

A. (Nods head)

Q. And was that at Ali's direction?

A. Yes.

Q. Then what happened?

A. It was just me and him downstairs and he went and he locked the door.

Q. Are you talking about the bedroom door or the front door?

A. The front door to the house. And the bedroom there was sort of, it was blocked off from the rest of the house. And he somehow, I don't remember, but he took off my pants and he took off his pants, and—

Q. —Let me stop you for a minute, Dawn. When you say he took off your pants, are you talking about like bluejeans or are you talking about underpants?

A. Everything. My pants and my underwear.

Q. And did you have any sort of a top on?

A. Yes.

Q. Okay. Was that ever taken off?

A. No.

Q. Okay. He took off—you were nude from the waist down, is that correct?

A. Um-hum.

Q. You indicated he took off his pants, are you talking about again his—

A. —He didn't take them all the way off, he just pulled them down.

Q. His trousers as well as his underpants?

A. Um-hum.

Q. You have to speak out loud.

A. Yes.

. . . . .

Q. And what happened as he took his pants and underwear down?

A. It just went on with this game, he called it. He kept on saying that everything was okay because earlier we were just all playing like we were sick. And he told us that he would make us feel better. So, when I was down there, he started rubbing his penis around my vagina and saying that he could make me feel good, and he didn't go in, he just like laid it on top of my stomach. And he made me touch it.

The witness continued to describe the incident. She explained that husband grabbed her hands and would not let go of them. She tried to fight him. He told her "to be quiet or [she] would just make it worse"; that she would get in trouble. She testified that husband "somehow used some butterscotch stuff and he put it on him and he told me to lick it off, and that's—I didn't want to do it. And I was scared." The witness testified that she started doing as he directed but she "didn't want to and ... started screaming." The witness explained that at the conclusion of the acts she described, the following occurred:

I was just fighting him and he kept on telling me that I was bad, and that he'd

tell my mom, and he told me that he'd get me taken away from my mom. And so I just—I was just screaming and fighting him and sooner or later Sharon came to the door. And the door was locked so she was trying to get in and he jumped up and zipped up his pants, and I was still laying on the bed, and I was crying. And Sharon came in and she asked me what was wrong and I tried to tell her and Ali got all mad and he went to go talk to her and told her that everything that I was going to say was a lie. And that I was just going to try to get him in trouble with Sharon because I didn't like him. So later, Sharon came up to me and she took me into the bathroom, and she asked me what had happened, and I tried to tell her. And she didn't believe me at first. And then Ali and Sharon started talking. And, again, they told me that if it really happened, if I really saw it, then I'd get—to draw a picture of it.

The witness was asked if she meant that she was asked to "[d]raw a picture of his penis." She answered that she was; that "while [she] was drawing it, [she] was telling [wife] everything that happened, and Ali got mad and he ripped up the paper."

Another witness, Patti Handley, testified that she lived at Springfield, Missouri; that she "babys[a]t for Mr. Ibrahim." She took care of Naji "[w]hen he's in the custody of his father." She described husband's relationship with Naji as "[g]ood." Ms. Handley was also asked to recall a time when husband was at her house over a Christmas holiday. Her seventeen year-old son was there also. She was asked, "Did Mr. Ibrahim refer to him as sweetie and pinch him between the legs?" She answered, "Yes."

Wife testified about an incident that Naji described to her after Naji and his father had taken a bath together. Naji told her "that his inflatable whale sucked daddy's peepee." The inflatable whale was a toy Naji got at a fair. Wife testified that the incident involving husband and the niece, when the niece was eight years old, and the incident Naji had described with the inflatable whale caused her concern about what

would occur if husband were awarded sole custody of Naji. She believed that Naji was very much in danger of sexual abuse if his father had custody.

■ Husband's first point on appeal contends that the trial court erred in awarding custody of Naji to wife. Alternatively, husband claims "[e]ven if the court properly awarded custody, it erred in failing to set forth a specific visitation schedule for husband's contact with the child." Husband contends, by his first point on appeal, that, with respect to the issue of custody, "the award was not based on substantial credible evidence." He contends that the trial court's decree "shows that the court was prejudiced against husband, such that the award of custody was an abuse of discretion." Regarding the trial court's granting husband "reasonable visitation rights with the Child" without specifying a particular visitation schedule, he complains he was denied "any contact whatsoever with the child, which denial was not supported by substantial evidence on the record and was against the weight of the evidence, and constituted an abuse of the court's discretion."

The facts heretofore set forth are amply sufficient to support the award of Naji's custody to wife. Considering that a trial judge can believe or disbelieve any testimony presented at trial, this court perceives no abuse of discretion by the trial court in awarding custody to wife. *See Robinson v. Estate of Robinson,* 768 S.W.2d 676, 677 (Mo.App.1989). The trial court's decision to award custody of Naji to wife was supported by substantial credible evidence.

■ Husband's alternative claim of error in his first point on appeal, viz., that the court erred by not specifying a specific visitation schedule is without merit. A specific visitation schedule would amount to an award of "joint physical custody," i.e., it would be "an order awarding each of the parents significant periods of time during which a child resides with or is under the care and supervision of each of the parents." § 452.375.1(2), RSMo Supp.1990.

In 1988, the general assembly added subsection 3 to § 452.375. Subsection 3 states:

The general assembly finds and declares that it is the public policy of this state to assure children frequent and meaningful contact with both parents after the parents have separated or dissolved their marriage, and that it is in the public interest to encourage parents to share decision-making rights and responsibilities of child rearing. In order to effectuate this policy, the court shall determine the custody arrangement which will best assure that parents share such decision-making responsibility and authority and such frequent and meaningful contact between the child and each parent, as is indicated *in the best interests of the child under all relevant circumstances.* (Emphasis added.)

As was recently stated in *Mehra v. Mehra,* 819 S.W.2d 351, 353 (Mo. banc 1991), "The statutes do not limit the discretion of the trial court to reject joint custody."

The award of visitation rights to noncustodial parents at reasonable times without further restrictions or directions is neither new nor unique. *See, e.g., Ritter v. Ritter,* 394 S.W.2d 78 (Mo.App.1965). Husband decries that such a custody order "denied husband any contact whatsoever with the child." The order makes no such denial. Furthermore, if circumstances change so that the best interests of the child would be served by other visitation provisions, the decree would be subject to modification. § 452.410, RSMo Supp.1990. This court does not find any abuse of discretion by the trial court in its awarding reasonable visitation rights to husband. This court perceives the award to be an award to husband of the right to visit the child at reasonable times, similar to the visitation privileges that were allowed in *Ritter, supra.* The coordination of the exercise of those rights is a matter for reasonable resolve between the custodial parent and the noncustodial parent.

■ Husband included in the verbiage of his first point on appeal the contention that the trial court was "prejudiced against the husband." He claims that a transmittal letter with which the trial judge forwarded

copies of the decree that was entered in the case demonstrated bias. The letter expressed concern about the future welfare of the child when he would be with husband. The evidence adduced at trial afforded a basis for the concern that was expressed. The letter was consistent with the decision that the trial court had reached. The statements in the letter were supported by the evidence at trial. Husband's claim that the letter demonstrated a bias by the trial court against him is unfounded.

■ Although this court reviewed husband's complaint about the transmittal letter, it is questionable whether a copy of the letter should have been included in the record on appeal.[1] This court stated in *State v. Magill,* 801 S.W.2d 725, 728 (Mo. App.1990), with respect to a letter the trial judge used to communicate the decision he had reached in that case, "[T]he letter … was correspondence between the trial court and counsel. It is apparent that it was not intended to be, nor was it, 'findings' upon which defendant is entitled to claim trial court error." A legal file consists of "portions of the trial record, proceedings, and evidence previously reduced to writing and filed in the trial court."[2] Rule 81.14(e).

■ The argument section of that part of husband's brief that is directed to the first point also contains prattle about husband's parents residing in Kuwait; about this case having come to trial "just days before the United States declared war on Iraq due to Iraq's invasion of Kuwait"; and about husband being Arab and a Moslem and wife being caucasian. Husband claims that these factors produced a bias by the trial court "in its dealings with Husband." That assertion is void of support in the record.

■ This court will not disturb a trial court's custody award unless it is manifestly erroneous and the welfare of the child requires a different disposition than that made by the trial court. *In Re Marriage of Goostree,* 790 S.W.2d 266, 267 (Mo.App. 1990). The custody award, including the visitation rights granted to husband, has not been shown to be manifestly erroneous. The welfare of the child does not require this court to disturb the custody award entered by the trial court. Husband's first point on appeal is denied.

■ Husband's second point on appeal is directed to the award of child support in the amount of $200 per month. Husband contends that the trial court erred in making that award "in that such an amount did not conform with the support calculated pursuant to Missouri Supreme Court Rule 88.01(e)." He argues that no finding was made "that the presumed amount calculated according to the rule was, after considering all the relevant factors, unjust or inappropriate," concluding that "the court failed to recognize Rule 88.01 at all," and, therefore, that "the court's order was an erroneous application of the law."

1. Here, as in *State v. Magill,* 801 S.W.2d 725, 728 (Mo.App.1990), the letter in question is not reflected on the trial court's docket sheets as having been filed as a document in the case. The copy of the letter that husband included in the legal file does not display a stamp indicating that it was filed in the court records.

2. As this court has previously observed, a circuit clerk who undertakes to "certify" as "legal file" the documents that are filed with this court as the legal file component of a record on appeal is inaccurate. *See State ex rel. Morris v. McDonald,* 817 S.W.2d 923, 927 n. 2 (Mo.App.1991). As stated in *McDonald,* "The legal file does not exist as part of the trial record, thus it is inaccurate for the clerk of the trial court to identify its contents, for purposes of the certification required by Rule 81.14(e), as 'legal file'." In this case, as in *McDonald,* the circuit clerk used a pre-printed form with the printed words at its top, "CLERK'S CERTIFICATE." By filling in the blanks on that form, the circuit clerk states that "the foregoing instrument" is the "LEGAL FILE." In fact, what precedes the pre-printed form are various pages from the circuit court file together with a copy of a transmittal letter used by the trial judge when he sent copies of the decree that was entered in this case to the attorneys of record. A typewritten page follows the printed form. It lists items under the typed heading, "Court Documents Certified by Clerk." There is nothing on the typed page that substantiates that the circuit clerk prepared it or even saw it. The page bears no signature, no verification of any kind, and its type is unlike that type that appears in the filled-in blanks of the pre-printed form. The typewritten page adds nothing of consequence to the "certification."

Rule 88.01, formulated in 1989 at the behest of § 452.340.7, RSMo Supp.1989, states certain relevant factors that must be considered, among all others, in determining an appropriate amount of child support. It provides that "[t]here is a rebuttable presumption that the amount of child support calculated pursuant to Civil Procedure Form No. 14 is the amount of child support to be awarded in any judicial or administrative proceeding for dissolution of marriage, legal separation, or child support." It states:

It is sufficient in a particular case to rebut the presumption that the amount of child support calculated pursuant to Civil Procedure Form No. 14 is correct if the court or administrative agency enters in the case a written finding or a specific finding on the record that the amount so calculated, after consideration of all relevant factors, is unjust or inappropriate.

In order to know what amount of child support is presumed to be "the amount of child support to be awarded," Civil Procedure Form No. 14 must be completed. Civil Procedure Form No. 14 is a worksheet for use in calculating the "presumed child support amount." The form contains specific "directions for use." The directions include the requirement, "The custodial and noncustodial parent shall calculate the presumed child support amount by completing the worksheet...." This is the manner in which a party invokes the benefit of the presumption permitted by Rule 88.01. He or she completes the form provided and makes it a part of the trial record. On appeal, a party who wishes to challenge the child support award on the basis that it does not conform to the requirements of Rule 88.01 may include in the legal file copies of Civil Procedure Form No. 14 that were before the trial court. Husband did not do this. He has not shown that he submitted a completed Civil Procedure Form No. 14 to the trial court. This is akin

to pursuing a different theory for recovery on appeal than was pursued at trial. As such, "this Court will not, on review, convict a lower court of error on an issue which was not put before it...." *Lincoln Credit Co. v. Peach*, 636 S.W.2d 31, 36 (Mo. banc 1982). Husband's second point is denied.

■ Husband's third point on appeal is directed to the division of marital property made by the trial court, specifically to the trial court's order that husband pay wife $5,000 "to cause the distribution of Marital Property to be fair and just." Husband contends that the trial court erred in ordering him to make that payment; that "the award was not supported by the evidence and was against the weight of the evidence, and constituted an abuse of the court's discretion."

In his brief, husband lists the following values for the items of marital property that belonged to the parties, being those values that wife provided in the financial statements she filed with the court:

| ASSET | VALUE |
|---|---|
| 1978 Ford van | $1,000 |
| 1977 Yamaha motorcycle | 500 |
| Checking account (wife) | 50 |
| Checking account (husband) | 300 |
| 1986 Mazda pickup | 3,500 |
| 1979 Ford Mustang | 1,500 |
| Household furnishings | 1,000 |
| SUBTOTAL | $7,850 |
| LESS debt from Mazda | (3,500) |
| TOTAL | $4,350 |

■ Husband argues, based upon the values stated, that upon payment by him of the $5,000 he was ordered to pay wife, she would receive 115% of the value of the marital property.[3] His calculation apparently was made by dividing the amount he was required to pay wife, $5,000, by the net

---

**3.** Husband also argues that since the trial court did not "allocate the debts" among the parties, they are his responsibility; that this should be considered in assessing the reasonableness of the trial court's division of marital property. In making this argument, husband fails to recognize that the trial court had no authority to absolve either party from whatever debts he or she had incurred. The liability of each party for existing debts is based upon the particular agreements each or both of them had with their creditors. Husband presented no evidence about the debts. This court will not speculate about what debts are attributable to each.

value of the marital property set out in his brief, $4,350.

Husband received the Ford van, the Yamaha motorcycle, the Mazda pickup and the Ford Mustang. According to the values listed, they were worth $6,500. The Mazda pickup is not listed on the financial statement that husband filed with the trial court. It is listed on one of the financial statements filed by wife. She attributed a value of $3,500 to it. Her financial statement listed as "amount owed thereon" the word "unknown." A line has been drawn through "unknown." Immediately following the lined-out word, there appears the handwritten amount, "$3,500." From this, it is inferable that the Mazda is encumbered by an amount equal to its value. If that is correct, the assets that husband received, disregarding whatever value may have been attributed to any household furnishings that he had in his possession, had a net value of $3,300. The assets that wife received, disregarding whatever value may have been attributed to any household furnishings in her possession, had a value of $50. Without considering the household furnishings, that division of property resulted in 98.5% going to husband and 1.5% to wife. The trial court undertook to effect a more equitable result by ordering husband to pay $5,000 to wife.

■ Appellate review of a trial court's distribution of marital property is governed by established principles:

First, the trial court has broad discretion in dividing marital property. *In re Marriage of Brewer,* 592 S.W.2d 529, 532 (Mo.App.1979). Second, the division must be just, but it need not be equal. *Hilger v. Hilger,* 570 S.W.2d 736, 740 (Mo.App.1978). Third, in dividing the marital property, the trial court is unfettered by "rigid methods or mechanics." *Id.* Finally, the appellant bears the burden of demonstrating error in the judgment. *In re Marriage of Brewer, supra* at 532.

*Calia v. Calia, supra.* Further, a trial court has authority to order cash payments to effect a just division of marital property. *See Calia v. Calia, supra, citing, Claunch*

*v. Claunch,* 525 S.W.2d 788 (Mo.App.1975). This court does not find that the trial court abused its discretion in dividing marital property. Husband's third point is denied.

■ Husband's fourth point on appeal asserts that the trial court erred in ordering that he pay an amount for wife's attorney fees. He contends that wife did not request attorney fees in her petition and that "no competent evidence of attorney fees was adduced at trial." He concludes that "the court's award of fees to wife was a misapplication of the law, was not supported by the evidence, and was an abuse of the trial court's discretion."

The pleading that wife filed, her Answer to Amended Petition for Dissolution of Marriage, did not request attorney fees. Immediately before the start of the trial, however, the trial court conducted "a pretrial conference on the record." Both parties and their attorneys were present, and the parties were placed under oath for purposes of answering questions. Husband was questioned first, then wife was questioned. Husband was asked some additional questions after the trial judge had inquired of wife. The trial judge inquired whether there were preliminary matters that should be taken up. Wife's attorney was permitted, with the consent of husband's attorney, to file "some answers to interrogatories as well as the income and expense financial statements." The court then inquired about the nature of the property for division between the parties and was told that it was all personal property. The parties agreed that certain items were nonmarital property and that those items of property could be set over to wife. They acknowledged that the disposition of certain other property was in dispute. Other personal data about the parties was obtained by means of the court asking questions of husband and wife. Each of the parties provided information regarding their educations, their employment, and whether they had prior marriages. The issues of attorney's fees and maintenance were addressed in the course of the inquiry by the court. The parties were asked the

following questions and gave the following answers:

THE COURT: ... First of all, is there an issue of maintenance in this case? Do you request maintenance for your support?

THE WITNESS: Yes. I'm asking for some alimony, for a short period of time, anyway.

THE COURT: All right. And do you ask for attorney's fees in this case?

THE WITNESS: Yes.

THE COURT: And have you paid any fees to your attorney up to this date?

THE WITNESS: Yes, I have.

THE COURT: And can you say approximately how much?

THE WITNESS: A thousand dollars.

THE COURT: Okay. Now, Mr. Jackson, have depositions been taken in this case?

MR. JACKSON [Wife's attorney]: No, your Honor.

THE COURT: All right. Mr. Ibrahim, I want to ask you those same questions. Do you request maintenance for your support from your wife?

THE WITNESS: No.

THE COURT: All right. Do you request your wife to pay attorney's fees on your behalf?

THE WITNESS: No.

No objection was made to the request for attorney fees at that time and no further evidence was presented on the issue.

In *Riley v. Riley,* 778 S.W.2d 666 (Mo. App.1989), an issue similar to this was addressed. There no request was made in the pleading for attorney fees. Mrs. Riley attempted to introduce evidence regarding payment of attorney fees. Opposing counsel objected. The trial court permitted her to testify "subject to the objection." *Id.* at 669. The trial court subsequently denied Mrs. Riley's request for attorney fees because she had not requested them in her pleading and the case was affirmed as to that issue. *Id.* However, a different result occurred in *Riley* with respect to maintenance. Although Mrs. Riley had not requested maintenance in her pleading, testimony related to her living expenses was

presented without opposing counsel objecting. On appeal, the Western District of this court held that Mrs. Riley's answer was amended by implied consent to request maintenance. *Id.* The court observed "that a failure to object to evidence offered beyond the scope of the pleadings results in automatic amendment of the pleadings to conform to the evidence and is a consent to try the applicable issue." *Id.* This court recently followed that decision with respect to maintenance in *Yount v. Yount,* 821 S.W.2d 876 (Mo.App.1991).

This case differs from both *Riley* and *Yount.* It differs from *Riley* with respect to the matter of attorney fees because, in *Riley,* testimony about attorney fees was adduced in the regular course of the trial and timely objection was made as to the testimony. In *Yount,* the issue that was presented related to maintenance. It also was raised in the regular course of the trial but no objection made. In this case, the matter of attorney fees was raised in a proceeding that the trial judge referred to as pretrial conference. That proceeding was held immediately prior to the actual trial. This court notes, however, that no recess or other break appears in the trial transcript between the pretrial conference and the commencement of the trial. At the conclusion of the testimony that was presented in the pretrial conference, the trial judge announced that the income and expense financial statements had been received from each party and that they would be filed. The trial judge indicated that it was unnecessary that he hear opening statements, but that if either party wished to make an opening statement, he would like to hear it then. The attorneys for both parties waived opening statements. The court advised petitioner that he could proceed and petitioner's attorney called his client as the first witness. The court advised husband that he "was under oath" and direct examination of husband by his attorney followed.

Neither the trial court nor the parties treated the proceedings that were identified as "pretrial conference" differently from the trial proceedings that followed.

The pretrial conference consisted of testimony from both parties about issues capable of resolve at the outset of trial. Thereafter, at the appropriate points in the trial, husband and wife were recalled and testimony was elicited from each about contested issues.

Considering the scenario immediately before the first witness was formally called to testify in this case, this court finds no basis for distinguishing between the recorded testimony given in what was denominated "pretrial conference" and trial. The trial was but a continuation of the evidence adduced at the pretrial conference. Under these somewhat unique facts, this court holds that the testimony of wife, given without objection, whereby she requested payment of attorney fees and her testimony that she had paid $1,000 to her attorney, was sufficient to and did constitute an amendment of her pleading to request that husband be ordered to pay her attorney fees. As was the situation in *Riley* with respect to the issue of maintenance, the failure to object to the evidence offered beyond the scope of the pleadings resulted in automatic amendment of the pleadings to conform to the evidence and was consent to try the issue.

"The trial court was not required to hear evidence on the extent and value of the legal services rendered, as the judge is considered an expert on that question and can fix that amount without the aid of evidence." *In Re Marriage of Haubein*, 726 S.W.2d 433, 437 (Mo.App.1987), *citing In Re Marriage of Brewer*, 592 S.W.2d 529, 536 (Mo.App.1979). Husband's fourth point is denied. The judgment of the trial court is affirmed.

CROW and MONTGOMERY, JJ., concur.

PREWITT, P.J., recused.