Pamela J. Loetel PUZZANCHERA, Clifford S. Brown and Bank of America, N.A., as Successor to Boatmen's Trust Company, Co–Trustees of the Christine A. Loetel Irrevocable Trust Agreement dated December 14, 1995, Petitioners–Respondents,

v.

David A. LOETEL, Respondent–Appellant, and Stephanie L. Loetel, individually, and Pamela J. Loetel Puzzanchera, f/k/a Pamela Loetel, individually and as Personal Representative of the Estate of Christine A. Loetel and Jeremiah W. "Jay" Nixon, Attorney General of the State of Missouri, Respondents–Respondents.

No. SD 28895.

Missouri Court of Appeals, Southern District, Division One.

Aug. 25, 2009.

---

Stuart H. King, Springfield, MO, for Appellant David A. Loetel.

Rodney H. Nichols, Springfield, MO, for Respondents Puzzanchera, Brown & Bank of America.

Bob Carlson, St. Louis, MO, for Respondent Jeremiah W. (Jay) Nixon.

JEFFREY W. BATES, Judge.

In 1995, Christine Loetel (Christine) executed an irrevocable trust agreement (the Trust) which specifically prohibited her from exercising a power of appointment in favor of her father, David Loetel (David).[1] In 2003, Christine executed a Last Will & Testament (the 2003 Will), in which Christine purported, *inter alia,* to exercise a power of appointment in favor of David. Following Christine's death in 2005, the co-trustees of the Trust filed a declaratory judgment action to determine the legal effect of the 2003 Will. David filed a counterclaim and cross-claim alleging undue influence and mistake in the creation of the Trust. After a bench trial, the court denied David's claims and determined that Christine's subsequent exercise of her power of appointment in David's favor was invalid. David appealed. This Court affirms.

In this court-tried case, our review is governed by Rule 84.13(d) and the principles articulated in *Murphy v. Carron,* 536 S.W.2d 30, 32 (Mo. banc 1976).[2] This Court must affirm the trial court's judgment unless it is not supported by substantial evidence, it is against the weight of the evidence, or it erroneously declares or applies the law. *Salem United Methodist*

---

1. Because several parties share the same surname, we refer to each by their first name for purposes of clarity; no disrespect is intended.

2. All references to rules are to the Missouri Court Rules (2009).

*Church v. Bottorff,* 138 S.W.3d 788, 789–90 (Mo.App.2004). "We review the evidence and all reasonable inferences in the light most favorable to the judgment and disregard all contrary evidence and inferences." *Arndt v. Beardsley,* 102 S.W.3d 572, 574 (Mo.App.2003). We defer to the trial court's determination of witness credibility and recognize that the court is free to accept or reject all, part or none of the testimony presented. *Christian Health Care of Springfield West Park, Inc. v. Little,* 145 S.W.3d 44, 48 (Mo.App.2004). In addition, this Court considers all fact issues upon which no specific findings were made to have been found in accordance with the result reached. Rule 73.01(c); *Surrey Condominium Ass'n, Inc. v. Webb,* 163 S.W.3d 531, 536 (Mo.App.2005). Our summary of the evidence, which is set forth below, has been prepared in accordance with these principles.

Pamela Loetel Puzzanchera (Pam) and David married in 1974 and divorced around 1981. During their marriage, they had two daughters. Their first daughter, Stephanie Loetel (Stephanie) was born in 1975. In December 1977, Christine was born prematurely. Thereafter, she was diagnosed with cerebral palsy. As a result of this condition, she had difficulty walking and suffered from a speech impediment. She also suffered from hearing loss, which was later resolved quite effectively through special hearing aids. Despite these physical limitations, she did not suffer from any mental impairment. She was able to attend Springfield public schools and graduated from Kickapoo High School. At trial, it was undisputed that Christine was intelligent and had the capacity to execute the Trust.

As a result of events surrounding Christine's birth, Pam asserted a medical malpractice action on Christine's behalf. The case was settled in 1984, and the proceeds were used to purchase two annuities for Christine's benefit. Because she was then a minor, the probate division of the circuit court appointed Pam to act as Christine's conservator.

When Christine was 17 years of age, an attorney advised Pam that the conservatorship would terminate when Christine reached the age of 18. The attorney recommended that something be done to protect and manage Christine's funds. Pam contacted attorney Cliff Brown (Brown). Based upon discussions among Pam, Christine and Brown, it was determined that a trust was the best mechanism for Christine to protect her funds and insure that she had money available to her for the rest of her life.

In October 1995, Pam sent Brown a letter addressing the contemplated estate plan for Christine and listing specific issues for Brown's consideration. On November 9, 1995, Brown met with Pam and Christine at his office. Brown testified that Christine actively participated in the meeting, at which the items set forth in Pam's October 1995 letter were discussed in significant detail. Brown explained what a trust was, how Christine's desires would be set forth in the trust and whether she wanted to include all of the provisions mentioned in Pam's letter. Because of Christine's speech impediment, Brown had difficulty understanding some of Christine's words. When that occurred, Pam would explain to Brown what Christine had said. Brown was able to understand Christine saying "yes" or "no" in response to various questions.

One concern mentioned in Pam's letter was that David would attempt to gain access to Christine's money because:

> Christy's father, David A. Loetel, is an alcoholic. He contemplates bankruptcy on a regular basis. His only asset is the home that we purchased when we were

married, which he has refinanced twice for loan consolidation. Christy's money is an easy target for him.

Pam recommended that she and David only receive one dollar from Christine's estate. Pam believed that this small bequest would preclude any legal challenge by David. During the November 9th meeting, Brown was told that David had left Pam and Christine shortly after her birth and that she had had little, if any, contact with her father since that time. According to Brown's notes from the meeting, there was a discussion about David being prohibited from receiving any benefits under the Trust. Brown explained to Pam and Christine that it was not necessary to leave any money to those persons for whom Christine did not want to provide; specifically referencing those individuals in the Trust would suffice.[3] Brown testified that the provision excluding David from receiving anything pursuant to a power of appointment was included because it was what Christine wanted. While Pam did communicate with Brown concerning the contents of the contemplated trust, Christine did not hesitate to voice her disagreement when Pam said something inconsistent with her desires. Christine never expressed any disagreement with, or objection to, the characterization of her relationship with David or to him being precluded from receiving any assets from the Trust. Brown testified that he would not have drafted the Trust based only on communications with, or directions from Pam; his only concern was accurately stating Christine's desires. Brown's notes from the November 9th meeting also reflected a discussion of the fact that any

exercise of the power of appointment would be subject to probate court approval. The rationale for having court approval on these matters was to address any future situation where Christine's physical or mental condition had changed.

At trial, there was evidence suggesting an additional reason that had not been disclosed to Brown during the November 9th meeting for Christine to be opposed to David receiving any Trust assets. Between ages six and eleven, Christine was subjected to repeated sexual abuse by David's brother, Ed Loetel (Ed). When Ed's actions were discovered, David did not want Ed to be prosecuted. Instead, David wanted Ed to receive counseling and therapy. Notwithstanding David's opposition, Ed was prosecuted, convicted and sentenced to serve 15 years in prison. David continued to have contact with Ed, which caused Christine to feel betrayed by, and resentful towards, David. Christine was concerned that, if she left money to David, he might ultimately transfer some of it to Ed. Stephanie testified that Christine would have never wanted Ed to get any of her money.

Around December 6, 1995, Brown forwarded an initial draft of the Trust to Pam and Christine for review. The initial draft identified Christine as the grantor, and Pam, Brown and Boatmen's Trust Company as trustees (collectively, the Co–Trustees). This draft included the provision barring Christine's exercise of the power of appointment in favor of David or any of his blood relatives, other than Stephanie.[4] This draft also included the provision requiring court approval of any amendments

---

**3.** At trial, Pam's letter to Brown and his notes from the November 9th meeting were admitted in evidence.

**4.** The initial draft also included provisions that no distributions were to be made to

David and that he was not to be appointed as a trustee under any circumstances. These same provisions were included in the final version.

to the trust, which was included because of concern over the possibility that Christine's condition might deteriorate in the future. In addition, the Co–Trustees did not want to place themselves in a position of having to decide which amendments might be appropriate. This draft also included: (1) a bequest to Stephanie for $5,000; (2) general instructions on the use of remaining funds for charitable purposes; and (3) a requirement that the Co–Trustees consult with Christine on an annual basis.

One week later, Brown received a handwritten letter from Christine requesting three modifications to the draft trust. Christine wanted to: (1) increase a bequest to Stephanie from $5,000.00 to $20,000.00; (2) include specific instructions on how the remaining funds were to be used for certain charitable purposes; and (3) include a requirement that the Co–Trustees consult with her on a semi-annual basis. Christine's letter did not request that any changes be made to the provision barring her from exercising a power of appointment in David's favor.

After receiving Christine's letter, Brown revised the Trust in accordance with Christine's wishes. In addition, Pam was removed as a beneficiary at her request. Rather than receive any money personally, she asked that those funds be used for the charitable purposes chosen by Christine. The final version of the Trust incorporated all of these changes. Prior to executing the Trust, Brown once again met with Christine. He reviewed the various provisions of this draft and pointed out the changes that had been made, including those specifically requested by Christine. Brown also testified that Christine understood the extent of her property that was being placed in the Trust. When the conservatorship terminated upon Christine's 18th birthday, she was required to sign a document listing all of the assets of the conservatorship estate and assigning dollar values to those assets.

Christine signed the final version of the Trust at Boatmen's Bank on December 14, 1995. Article Two prohibited her from exercising a power of appointment in favor of David, and Article Seven required court approval of amendments:

> **ARTICLE TWO:** If authorized by an order of the Circuit Court of Greene County, Missouri, Probate Division, after a full hearing and after taking into consideration the provisions of this ARTICLE TWO, [Christine] shall, by her Will, have the power to appoint all or any part of the principal and undistributed net income of the trust estate remaining at her death, if any, subject, however, to the following:
>
> (1) The power shall not be exercisable to any extent, directly or indirectly, in favor of [Christine's] father, DAVID A. LOETEL, or anyone related to him by blood or marriage, excepting only [Christine's] sister, STEPHANIE L. LOETEL, or her descendants. The phrase "directly or indirectly" shall include, without limitation, a prohibition on [Christine's] father, or anyone so related to him, being appointed a trustee or in any other manner exercising any control over or deriving any benefit from the trust estate.
>
> . . . .
>
> **ARTICLE SEVEN:** Except as hereinafter specifically provided, the trust estate herein created and this Trust Agreement shall be irrevocable and not subject to change, alteration or amendment by [Christine], [Christine] shall have no right or power whatsoever to terminate, in whole or in part, any trust estate herein created and [Christine] hereby forever relinquishes each and every right, power and privilege in and

over the property subject to the terms and provisions hereof. Notwithstanding the foregoing provision, or any other provision of this Trust Agreement to the contrary, this Agreement may, at any time and from time to time, be altered, amended, modified or revoked, in whole or in part, if [Christine] and the individual Trustees or Trustee then serving agree with respect thereto and such is then approved, after full hearing, by the Circuit Court of Greene County, Missouri, Probate Division.

The signed version of the Trust was retained by the Co–Trustees. Brown had no doubt that Christine understood the Trust and was competent to sign it.

Several years elapsed before Brown had any further interaction with Christine. In the fall of 2003, Brown met with Christine at least twice and also spoke to her by phone regarding the Trust.[5] The primary topic of discussion was Christine's request that the amount of her distributions be increased, which was approved. During these discussions, Christine made no statements to Brown suggesting that she did not understand the Trust or that it did not accurately reflect her desires when she executed it. During one of the conferences, Christine said she was considering an amendment to the Trust and asked how to do it. Brown explained that any amendment of the Trust had to be approved by the probate division of the circuit court. Christine did not describe any specific amendment, other than possibly removing Pam as one of the three co-trustees.

Around this same time period, Brown learned that there had been a falling out between Pam and Christine. Pam told Brown that she did not want to participate in any decisions relating to the Trust. Thereafter, all such Trust decisions were made by co-trustees Brown and Bank of America.[6]

In 2003, Pam and Christine were residing in Ft. Myers, Florida. In October of that year, Christine visited David in Kansas City. While staying with David, Christine signed a letter addressed to a Ft. Myers attorney named Richard Winesett (Winesett). David testified that Christine drafted the letter on his computer. In the letter, Christine stated that she had mailed a copy of the Trust to Winesett and that she had "never read the Trust agreement before." She also said she was unhappy with the Trust and wanted to discuss the matter with Winesett in person:

> Yesterday, my father and I read over the agreement. I have asked him for assistance when I needed help. I am very unhappy with the way the Trust is set up. I was very shocked that I even I[sic] signed the documents and I also believe that it was just a big cover up. My mother is one of my trustee [sic] and we are unable to communicate which makes this a very difficult situation. I also believe that my mother, Mr. Brown, and Bank of America in Springfield, Missouri are not living up [sic] the agreement according to the Trust. I will discuss this with you when I meet with you in person.

On October 27, 2003, Christine met with Winesett. According to Winesett, Christine said she did not believe the Trust should be binding upon her. Winesett recalled only that Christine felt the Trust restricted her too much and that she was not being given adequate funds. Christine

---

5. At trial, Brown's notes regarding his discussions with Christine were admitted in evidence.

6. Bank of America was the successor trustee to Boatmen's Trust Company.

never told Winesett that she was upset about David being excluded or that she could not exercise a power of appointment in David's favor. Christine said nothing at all to Winesett about her relationship with David.

Winesett told Christine that, if she did not like the terms of the Trust or how it was being administered, she should consult with a Missouri attorney about the possibility of revoking the Trust. Nonetheless, Christine requested his assistance in preparing a will that contained an exercise of a power of appointment in favor of Pam, Stephanie and David. Winesett was aware of the procedure to be followed under the Trust if Christine wanted to exercise the power of appointment. Winesett advised Christine that the Trust procedure would not be fully followed in exercising the power of appointment in a will and, therefore, might not be effective. Winesett specifically recommended to Christine that she consult with a Missouri attorney about following the procedures set forth in the Trust for exercising the power of appointment. Christine declined that advice. Winesett prepared the 2003 Will, which was executed on November 4, 2003.

The 2003 Will included the following provisions in which Christine purported to exercise her power of appointment in equal amounts in favor of Pam, Stephanie and David:

VI. *EXERCISE OF POWER OF APPOINTMENT*

I hereby exercise the power of appointment described in Article TWO of that certain document entitled "IRREVOCABLE TRUST AGREEMENT" dated December 14, 1995, which lists me as Grantor, and Pamela J. Loetel, Clifford S. Brown and Boatmen's Trust Company, as Trustees as follows:

I appoint to my mother, PAMELA J. LOETEL, if she survives me, the great-er of $150,000.00 or 15% of the balance held in trust thereunder at the time of my death plus a proportionate share of the income until actually distributed, free from estate and other death taxes, and to be distributed to her as soon as feasible after my death. If she fails to survive me, I appoint such amount proportionately to the other appointees who do survive me.

I appoint to my sister, STEPHANIE L. LOETEL, if she survives me, the great-er of $150,000.00 or 15% of the balance held in trust thereunder at the time of my death plus a proportionate share of the income until actually distributed, free from estate and other death taxes, and to be distributed to her as soon as feasible after my death. If she fails to survive me, leaving lineal descendants surviving me, I appoint her share to such lineal descendants. If neither my sister nor any of her lineal descendants survive me, I appoint such amount proportionately to the other appointees who do survive me.

I appoint to my father, DAVID A. LOETEL, if he survives me, the greater of $150,000.00 or 15% of the balance held in trust thereunder at the time of my death plus a proportionate share of the income until actually distributed, free from estate and other death taxes, and to be distributed to him as soon as feasible after my death. If he fails to survive me, I appoint such amount proportionately to the other appointees who do survive me.

In addition, Winesett added the following language to the 2003 Will suggesting that Christine believed that the Trust had been imposed on her by those upon whom she had relied and trusted without adequate explanation:

By exercising this power of appointment I do not endorse, accept nor ratify that

trust nor its purported irrevocability. It was imposed upon me immediately after my 18th birthday by those upon whom I have relied and trusted without adequate explanation to me as to its meaning or effects. I have not had a copy of the trust available to me since then until the last few weeks. Regardless of their motives, the trust purports to restrict me unreasonably and deprive me of rights without any consideration to me. It is my present intention to sue to have it set aside, but I make the appointment in this will to provide for the possibility of my death before the trust is set aside.

Winesett admitted that Christine never specifically stated any of this to him. He crafted this language on his own because he thought it was what Christine felt. According to him, Christine ratified the language he used.[7] By Winesett's own admission, the 2003 Will did nothing to address Christine's concerns that the Trust was too restrictive and did not provide her with adequate funds. In addition, Winesett knew there was a likelihood that the purported exercise of the power of appointment in the will would be invalid.

Thereafter, Christine consulted with Art Duncan (Duncan), an attorney practicing in Springfield, Missouri. Duncan met with Christine and her friend, Wendy Pace (Pace) on multiple occasions. Christine asked what she would have to do to amend or revoke the Trust. Duncan told Christine that she would have to follow the procedure set forth in the Trust or initiate an action to set the Trust aside. Duncan explained that, regardless of the terms of the Trust, if Christine did not believe it

represented her true desires, she could pursue an action to set it aside without the consent of the Co–Trustees. Christine said that she would only go to court as a last resort.

Although three attorneys had advised Christine that she should seek court approval of any amendments or pursue litigation to have the Trust revoked, she never did so. Pace testified that, after she and Christine met with Brown in 2003 and Christine's weekly allowance from the Trust was increased, Christine decided that she did not want to take any further action with respect to the Trust.

Christine died on January 10, 2005. Thereafter, the Co–Trustees learned about the 2003 Will in which Christine purported to exercise a power of appointment without following the procedure set forth in the Trust. The Co–Trustees filed a declaratory judgment action in the Circuit Court of Greene County, Missouri, to ascertain the legal effect, if any, of the 2003 Will. David filed a counterclaim and cross-claim alleging that the Trust had been created as the result of undue influence and/or mistake. David also asserted that the Trust had been amended by the 2003 Will and that Christine had validly exercised her power of appointment in his favor.

After a bench trial, the court specifically found that David was not entitled to relief on his counterclaims and cross-claims because "[t]here was insufficient evidence presented to establish that Christine executed the Trust as a result of undue influence, mistake or fraud[.]" The court also decided that: (1) the 2003 Will did not

7. The 2003 Will named Pam as personal representative. The successor personal representative was a Florida attorney whom Winesett recommended, but whom Christine did not know. When a family member was selected as personal representative, it was Winesett's custom to recommend that another family member be named to act as the successor. Christine chose not to name any other family member, including David, as successor personal representative.

amend the Trust; (2) the power of appointment in the Trust had not been exercised by Christine; and (3) David was to take nothing from the Trust. This appeal followed. Additional facts necessary to the disposition of the case are included below as we address David's three points of error.

*Point I*

■ In David's first point, he contends the trial court erred in finding that Pam did not unduly influence Christine to create the Trust. David argues that he presented sufficient evidence to entitle him to a presumption of undue influence, which the Co–Trustees did not rebut.[8] "Undue influence is defined as overpersuasion, coercion, force, or deception that deprives an individual of her free agency." *Mace v. Loetel,* 166 S.W.3d 114, 117 (Mo.App.2005); *Robertson v. Robertson,* 15 S.W.3d 407, 413 (Mo.App.2000). A presumption of undue influence arises when a party presents substantial evidence of: (1) the existence of a confidential and fiduciary relationship; (2) a benefit being conferred upon the

fiduciary; and (3) some additional evidence from which undue influence may be inferred. *Duerbusch v. Karas,* 267 S.W.3d 700, 708 (Mo.App.2008); *Estate of Anderson v. Day,* 921 S.W.2d 35, 38 (Mo. App.1996). The element of benefit to the fiduciary can be shown by proving " 'some pecuniary benefit to be derived, directly or indirectly' ... by the Fiduciary by whose activity the [influenced person] is influenced...." *Baker v. Spears,* 357 Mo. 601, 210 S.W.2d 13, 19 (1948) (citation omitted).

■ Respondent contends no presumption of undue influence arose because David failed to present substantial evidence that Pam received any pecuniary benefit because of the Trust's creation. This Court agrees. According to David, Pam received a pecuniary benefit from the Trust because: (1) Christine retained the power to provide a benefit to Pam at a later time through a power of appointment; and (2) Pam received money through a settlement with the Co–Trustees in this litigation.[9] Neither argument has any merit. Before a presumption of undue

8. David also argues that the court incorrectly required him to meet a clear and convincing standard of proof as to undue influence. His assertion is based upon a letter from the court to counsel stating that "I do not find that there was clear and convincing evidence of undue influence, mistake or fraud sufficient to alter any portion of the trust." In the letter, however, the judge asked Co–Trustees' counsel to prepare a formal judgment. The judgment, which contains specific findings of fact and conclusions of law, makes no reference to David being required to meet a clear and convincing standard of proof as to undue influence. Because it is apparent that the trial court did not intend for the letter—rather than the actual judgment that was signed and filed—to constitute the court's findings and conclusions for purposes of appellate review, we decline to address David's argument. *See Ibrahim v. Ibrahim,* 825 S.W.2d 391, 396–97 (Mo.App.1992); *State v. Magill,* 801 S.W.2d 725, 728 (Mo.App.1990).

9. There is little information in the record on appeal concerning the subject of this purported settlement. At the beginning of the trial, the court announced that "some parties" had settled with the Co–Trustees. Co–Trustee Brown testified that he had signed a settlement agreement, but no details of the settlement were mentioned. No settlement agreement was admitted in evidence. Neither Pam nor Stephanie testified in person at trial, but their depositions were admitted in evidence. Pam only testified that she had been offered a settlement. Stephanie testified that she had reached an agreement in principle to settle and had signed a tentative agreement. The legal file, however, contains motions by both Pam and Stephanie to enforce an alleged settlement agreement that had not been consummated because of Co–Trustee Bank of America's failure to sign the document. There is no indication in the record that the court ever ruled on these motions.

influence could arise, there had to be evidence that Pam received a pecuniary benefit because Christine executed the trust. *See Estate of Anderson*, 921 S.W.2d at 38. The record contains no such evidence. When the Trust was executed by Christine, Pam's designation as a beneficiary had been removed at her own request. The unexercised power of appointment conferred no benefit upon Pam because it was unknown whether Christine would ever exercise that power in Pam's favor. All the unexercised power of appointment represented was a mere possibility of future pecuniary benefit that might never come to pass. Unknown and unidentified benefits do not support a claim for undue influence. *Id.* at 39. David has cited no authority holding that an unexercised power of appointment constitutes a sufficient pecuniary benefit to support a presumption of undue influence, and this Court declines to so hold.

■■■ We reach the same conclusion with respect to the Co–Trustee's apparent decision to settle Pam's claim, which was based upon Christine's exercise of a power of appointment in the 2003 Will. As mentioned above, it was unknown at the time the Trust was executed whether that power of appointment would ever be exercised in Pam's favor. In addition, the evidence demonstrates that Pam and Christine were estranged in 2003. The settlement occurred approximately 12 years after the Trust was executed and over two years after Christine died. The settlement of a disputed claim by the Co–Trustees is insufficient to prove that Pam received a pecuniary benefit because of undue influence exerted by her during the creation of the Trust. *See Id.* at 38. "[F]or an action involving undue influence to succeed, the element of benefit to the influencer must be established." *Id.* at 39. Because David failed to present sufficient evidence that

Pam received a pecuniary benefit because Christine executed the Trust, no presumption of undue influence arose. *Id.*; *see Burke v. Kehr*, 876 S.W.2d 718, 721 (Mo. App.1994). Point I is denied.

*Point II*

In David's second point, he contends the Trust should be reformed so as to remove the provision prohibiting Christine from exercising a power of appointment in David's favor. He argues that said prohibition was included by mistake and did not accurately reflect Christine's intent. David concedes the trial court made a contrary finding, but he argues that the finding was against the weight of the evidence.

■■ "An appellate court exercises extreme caution in considering whether a judgment should be set aside on the ground that it is against the weight of the evidence and will do so only upon a firm belief that the judgment was wrong." *Simpson v. Strong*, 234 S.W.3d 567, 578 (Mo.App.2007). The phrase "weight of the evidence" means its weight in probative value, rather than the quantity or amount of evidence. *Nix v. Nix*, 862 S.W.2d 948, 951 (Mo.App.1993). The weight of the evidence is not determined by mathematics, but depends on its effect in inducing belief. *Id.*

■ After reviewing the record, it is apparent that David's argument has no merit. The trial court found the Trust provision precluding Christine from exercising any power of appointment in David's favor accurately reflected her intent at the time the Trust was executed. This finding is not against the weight of the evidence. Brown testified that Christine actively participated in the November 1995 meeting at which the particulars of the Trust were discussed. One of the specific topics of discussion was that the Trust be drafted so

as to prevent David from receiving any of the assets. The initial draft of the Trust contained the provision barring Christine from exercising a power of appointment in David's favor. None of Christine's handwritten requested changes to the Trust pertained to this provision. When the final version of the Trust was prepared, Brown reviewed the document with Christine. She expressed no disagreement with the power of appointment provision. The Trust was executed by her in December 1995. Brown testified that the Trust accurately reflected Christine's intentions. Thus, there was substantial evidence to support the trial court's finding that Christine did intend to restrict her ability to exercise a power of appointment in David's favor when the Trust was signed.

David's contrary argument rests on a comment in the October 2003 letter to Winesett that Christine was "unhappy" with the trust and the language in the November 2003 Will that the Trust had been imposed on her without adequate explanation. In both instances, the trial court could have concluded that those statements did not accurately reflect Christine's intentions in 1995 when the Trust was executed. When the letter was written, there had been a falling out between Pam and Christine. She was with David when the letter was prepared on his computer. Similarly, the 2003 Will was drafted by Winesett. He admitted that the language used therein was his and only reflected what he thought Christine felt. It was up to the trial court to determine the credibility of this contrary evidence and decide what weight, if any, it should receive. *Christian Health Care of Springfield West Park, Inc. v. Little*, 145 S.W.3d 44, 48 (Mo.App.2004). After reviewing the record, this Court does not have a firm belief that the judgment was wrong. *Simpson v. Strong*, 234 S.W.3d 567, 578 (Mo.App.2007). Point II is denied.

*Point III*

In David's third point, he contends the trial court misapplied the law in making inconsistent and contrary rulings concerning the settlement of claims by Pam and Stephanie against the Trust. David argues that Pam and Stephanie both received a substantial benefit from Christine's exercise of a power of appointment under the Trust, while David was denied a similar benefit. This argument fails because nothing in the record establishes that the trial court made any ruling at all regarding the Co-Trustees' settlement of these claims. Ergo, the trial court could not have made an inconsistent or contrary ruling with respect to David's claim. This Court will not consider a point upon which no ruling has been made. *Long v. Missouri Delta Medical Center*, 33 S.W.3d 629, 647–48 (Mo.App.2000) (*abrogated on other grounds by State Bd. of Registration for Healing Arts v. McDonagh*, 123 S.W.3d 146, 153 (Mo. banc 2003)); *Oertel v. John D. Streett & Co.*, 285 S.W.2d 87, 99 (Mo. App.1955). It is axiomatic that an appellate court will not convict the trial court of error on an issue that was not put before it to decide. *Gillham v. LaRue*, 136 S.W.3d 852, 857 (Mo.App.2004). Point III is denied.

The judgment of the trial court is affirmed.

SCOTT, P.J., and BARNEY, J., Concur.